Filed 10/2/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| PATRICK OWENS et al., | B242291 |
| Plaintiffs and Appellants, | |
| v. | (Los Angeles County Super. Ct. No. BC419572) |
| COUNTY OF LOS ANGELES, | |
| Defendant and Respondent. | |
| | |
| LARRY PITTS, | B242393 |
| Plaintiff and Appellant, | |
| v. | (Los Angeles County Super. Ct. No. BC334027) |
| COUNTY OF LOS ANGELES, | |
| Defendant and Respondent. | |

APPEALS from a judgment and an order of the Superior Court of Los Angeles County, John Shepard Wiley, Jr., Judge. Affirmed.

Law Offices of Steven F. Carvel and Steven F. Carvel for Plaintiffs and Appellants Patrick Owens and Patricia Munoz.

Huskinson, Brown & Heidenreich, Paul E. Heidenreich and David W.T. Brown for Plaintiff and Appellant Larry Pitts

Jones Day, Elwood Lui, Brian D. Hershman and Erica L. Reilley for Defendant and Respondent.

_____

# INTRODUCTION

In this opinion we adjudicate two appeals challenging a user utility tax (UUT) enacted pursuant to a measure approved by the voters.  The appellants contend the UUT is unlawful because it violated the voters' due process and free speech rights and because the tax was imposed in violation of Proposition 218 and the Elections Code.  We publish this case to address these important substantive legal issues and to provide an example of when the doctrine of judicial estoppel should apply.

The present appeals arise from two separate superior court class actions against defendant and respondent County of Los Angeles (County); the first by plaintiff and appellant Larry Pitts and the second by plaintiffs and appellants Patrick Owens and Patricia Munoz.  Pitts appeals an order denying his motion to enforce a settlement and Owens and Munoz appeal a judgment.  We affirm the order and the judgment.

In both appeals appellant(s) challenge the legality of the County's UUT enacted pursuant to a measure approved by the voters on November 4, 2008 (Measure U). We reject all of the appellants' arguments on the merits.

We also conclude that Pitts is judicially estopped and barred by the terms of a settlement agreement he executed from pursuing his challenge to the UUT.  As we shall explain, the litigation conduct of Pitts and his counsel is precisely the kind of conduct the doctrine of judicial estoppel is meant to prohibit.

# BACKGROUND

1.  *The* Oronoz/Pitts *Class Action—The Challenge to the 1991 UUT*

In January 1991, the County enacted the Utility User Tax Ordinance (L.A. County Code, § 462.010 et seq.), establishing a utility user tax (the 1991 UUT).  The 1991 UUT imposed a 5 percent tax on telephone, electricity and gas usage.

In May 2005, Joe Oronoz and Larry Pitts filed a class action suit on behalf of taxpayers in the unincorporated parts of the County (the *Oronoz/Pitts* class action)

2

challenging the 1991 UUT on the grounds that it violated Propositions 13 and 62[1] because it was enacted without voter approval.[2] (*County of Los Angeles v. Superior Court* (2008) 159 Cal.App.4th 353, 357.) The County denies that the 1991 UUT was unlawful. On January 4, 2007, the trial court certified as a class all persons who paid the 1991 UUT since February 16, 2004.

      2.      *Short Form Settlement Agreement*

At a mediation on June 30, 2008, the parties in the *Oronoz/Pitts* class action executed a two-page short form settlement agreement. The agreement provided that the County would place $10 million in a general fund to be used to address education, medical needs, homelessness and/or police and fire protection in the unincorporated areas of the County. It also stated that the County would place $65 million in a claims fund to be used for taxpayer refunds.

The short form settlement agreement also stated: "County to hold an election in November 2008 to validate the UUT pursuant to applicable law at a rate of 4.5%. County agrees not to seek to raise the UUT rate for a period of 15 years following the election." Additionally, the agreement provided that if the UUT was not approved by the voters, the amount of money collected by the County from July 1, 2008 to the date of election would be added to the claims fund. Appellants contend that the amount of UUT the County was likely to generate during this time period was $25 million.

---

[1]     Proposition 13, approved by California voters in 1978, was codified in article XIII A to the California Constitution. Proposition 62, approved by California voters in 1986, added section 53720 et seq. to the Government Code.

[2]     Craig Kaufman and Cheryl Kaufman were added as named plaintiffs in the first amended complaint filed in the *Oronoz/Pitts* class action. Oronoz, Pitts and the Kaufmans shall sometimes collectively be referred to as the "*Oronoz/Pitts* plaintiffs." At some point, Joe Oronoz apparently ceased serving as a class representative.

3

The agreement further provided that the settlement was contingent upon approval by the County Board of Supervisors (Board) and that retired judge Dickran Tevrizian retained "jurisdiction to mediate any disputes in the drafting of the settlement agreement." The agreement also stated that notice to class members of the settlement "shall not be sent until after the election is held in November, 2008." Class counsel was required by the agreement "to cooperate with the County in seeking voter approval of the UUT."

On July 1, 2008, the Board approved of the settlement in the *Oronoz/Pitts* class action in a closed session. The Board resolved that "[t]he substance of the settlement will be disclosed upon inquiry by any person as soon as the settlement becomes final following approval by all parties."

3.      *The Ballot Materials Related to Measure U*

In the official ballot sent to voters in unincorporated areas of the County, Measure U stated: "**THE UNINCORPORATED LOS ANGELES COUNTY UTILITY USERS' TAX CONTINUATION MEASURE**. Shall an ordinance be adopted to validate and reduce Los Angeles County's existing utility users tax from 5 percent to 4.5 percent; to continue funding essential services, including sheriff's deputies, parks, libraries, street repairs, and other general fund services; update definitions to require equal treatment of taxpayers regardless of technology used; provide public review of expenditures and independent audits, and continue the low-income senior exemption?"

The official ballot also included an impartial analysis by County Counsel, arguments in favor and against Measure U, and a redlined version of the Utility Users Tax Ordinance, which set forth the exact language of the proposed ordinance and the changes made to the previous ordinance. We shall discuss the ballot materials in greater detail in our discussion of the merits of appellants' challenge of the legality of Measure U.

4

4.    *The Election*

Prior to the election, the County provided the ballot materials discussed *ante* to the voters.  Larry Pitts received these materials.  On November 4, 2008, 62.92 percent of the voters approved Measure U.  We shall refer to the UUT enacted pursuant to Measure U as the "2008 UUT."

5.    *Long Form Settlement Agreement*

On November 5, 2008, after lengthy negotiations, the *Oronoz/Pitts* plaintiffs executed an 18-page long form settlement agreement.[3]  This agreement incorporated most of the principal terms of the short form settlement agreement.  Under the long form settlement agreement, the County was required to pay $10 million to a general fund and $65 million to a claims fund.  The agreement also stated the County would not increase the UUT rate above 4.5 percent at any time prior to November 4, 2023 and that the County would hold an election in November 2008 to "validate" the UUT at a rate of 4.5 percent.

The long form settlement agreement further provided that plaintiffs Joe Oronoz and Larry Pitts and all class members released the County of all claims.  We shall discuss this release in more detail *post*.

The agreement also stated that the County denied any wrongdoing or liability in connection with the 1991 UUT.  Additionally, the agreement provided that if the superior court did not approve the settlement, the agreement would be null and void.

6.    *Joint Motion for Preliminary Approval of Settlement and Motion for Preliminary Approval of Attorney Fees*

On November 6, 2008—two days after the election—the *Oronoz/Pitts* plaintiffs and the County filed a joint motion for preliminary approval of the settlement and

---

[3]    Although the record does not clearly indicate whether the *Oronoz/Pitts* plaintiffs themselves executed the document, it is undisputed that their attorney, with their authority, did so.  The *Oronoz/Pitts* plaintiffs are thus bound by the long form settlement agreement.  (*Blanton v. Womancare, Inc.* (1985) 38 Cal.3d 396, 403 [client is bound by acts of attorney within the scope of his express or implied authority].)

approval of forms and methods of notifying the certified class of the settlement (preliminary settlement approval motion). In this motion, the parties argued that the settlement provided non-monetary benefits, including requiring the County "to hold an election to validate the UUT pursuant to applicable law." The motion emphasized that the settlement was fair because it secured for the taxpayers the "right to vote" for the UUT, i.e., the "right to decide whether the County can assess the UUT."

In his declaration in support of the preliminary settlement approval motion, lead class counsel Paul Heidenreich stated that the non-monetary benefits of the settlement, including the November 4, 2008, election, "were important to the settlement obtained for the class." Heidenreich further stated: "Without the inclusion in the settlement package of the non-monetary benefits, the proposed settlement was not acceptable to class counsel."

Concurrently with the preliminary settlement approval motion, the *Oronoz/Pitts* plaintiffs filed a motion for preliminary approval of attorney fees, costs and payments to representative plaintiffs. In this motion, the *Oronoz/Pitts* plaintiffs sought an award of $50,000 to each class representative and an award of attorney fees in the amount of $25 million to class counsel. They argued that their counsel deserved to be paid $25 million because they secured many benefits for the class, including the "Constitutional right to vote." (Italics and boldface omitted.)

Indeed, in listing the six primary benefits secured by the settlement, the *Oronoz/Pitts* plaintiffs placed the election held on November 4, 2008, at the top of the list. The motion stated: "The benefits are: [¶] First, the settlement vindicated the taxpayers['] California Constitution, Article XIII **right to vote** and participate in the tax enactment process. Value of the Constitutional right: Priceless." (Fn. omitted.)

On November 20, 2008, the trial court entered an order granting preliminary approval of the settlement and authorizing notice to be provided to the class. Pursuant to this order, over 390,000 taxpayers were given notice of the settlement and a right to object. Only one taxpayer filed an objection.

6

On December 1, 2008, the trial court granted the *Oronoz/Pitts* plaintiffs' motion for preliminary approval of attorney fees and costs, and awarded plaintiffs' counsel $7,637,868.75 in attorney fees. The order further provided that the attorney fees "shall be paid from the settlement funds if and when final approval of the class settlement is granted."

7. *Final Judgment and Order in the* Oronoz/Pitts *Class Action*

Both the County and the *Oronoz/Pitts* plaintiffs filed briefs in support of the trial court's final approval of the settlement. In one of their briefs, the *Oronoz/Pitts* plaintiffs acknowledged that the sole objector to the settlement argued that Measure U was "confusing."

On April 28, 2009, the superior court entered a final order and judgment (judgment) in the *Oronoz/Pitts* class action. The judgment approved the settlement agreement, stating that it was "fair, adequate, and reasonable." It also dismissed the action, awarded class counsel $7,637,868.75 in attorney fees, and awarded each class representative, including Larry Pitts, $10,000.

8. *The* Owens *Class Action—The Challenge to the 2008 UUT*

On August 11, 2009, Patrick Owens and Patricia Munoz filed a class action complaint against the County challenging the legality of Measure U and the 2008 UUT (the *Owens* class action). The complaint alleged that Measure U violated, inter alia, the class members' due process and free speech rights, as well as Proposition 218.

9. *County's Motion for Summary Judgment in the* Owens *Class Action*

On November 12, 2010, the County filed a motion for summary judgment in the *Owens* class action on the grounds that plaintiffs failed to timely file and serve verified election contest statements as required by the Elections Code. The trial court entered an order denying the motion on February 15, 2011.

The order stated that the court had read three cases cited by plaintiffs' counsel[4] during oral argument and "finds that they recognize a post-election constitutional challenge to ballot materials that is independent of the Election[s] Code's election contest procedure." "As a result," the order further stated, "summary judgment must be denied because the complaint alleges constitutional claims related to the ballet materials and because County, in the moving papers, neither discusses the constitutional claims nor shows that they do not clear the constitutional bar." (Fns. omitted.)

Subsequently, the superior court set a briefing schedule for resolution of plaintiffs' constitution-based challenge to Measure U. Pursuant to that schedule the parties filed briefs on plaintiffs' claims that Measure U violated the voters' due process rights.

   10.    *Pitts's Motion to Enforce the Settlement in the* Oronoz/Pitts *Class Action*

In the meantime, on March 22, 2011, Larry Pitts filed a motion to enforce the settlement in the *Oronoz/Pitts* class action. Pitts made the motion pursuant to Code of Civil Procedure section 664.6 on the grounds that the November 4, 2008, election was not held "pursuant to applicable law," as required by the judgment and settlement agreement.[5] Pitts raised many of the same constitutional arguments Owens and Munoz raised in the *Owens* class action.

---

[4]    These cases were *Horwath v. City of East Palo Alto* (1989) 212 Cal.App.3d 766 (*Horwath*), *People ex rel. Kerr v. County of Orange* (2003) 106 Cal.App.4th 914 (*Kerr*), and *McKinney v. Superior Court* (2004) 124 Cal.App.4th 951.

[5]    Code of Civil Procedure section 664.6 provides: "If parties to pending litigation stipulate, in a writing signed by the parties outside the presence of the court orally before the court, for settlement of the case, or part thereof, the court, upon motion, may enter judgment pursuant to the terms of the settlement. If requested by the parties, the court may retain jurisdiction over the parties to enforce the settlement until performance in full of the terms of the settlement."

8

11. *The April 26, 2012, Hearing and Order*

On April 26, 2012, the superior court held a hearing on (1) plaintiffs' motion in the *Owens* class action to invalidate Measure U and (2) Pitts's motion in the *Oronoz/Pitts* class action to enforce the settlement. After the hearing, the court entered an order denying both motions.

In the order, the court rejected the plaintiffs' arguments on the merits. The court also found that Pitts waived his claims by signing the settlement agreement and was judicially estopped from challenging the election because he was taking a position contrary to the position he took in support of the settlement.

12. *Judgment in the* Owens *Class Action*

On May 10, 2012, the superior court entered a final judgment in the *Owens* class action in favor of the County. Owens and Munoz filed a timely notice of appeal of the judgment. On the same day, Pitts filed a timely notice of appeal of the order denying his motion to enforce the settlement.

## CONTENTIONS

Appellants contend that the ballot materials for Measure U were so profoundly deceptive that they violated the voters' due process rights. They also argue that Measure U violated Proposition 218 and the voters' free speech rights under the California Constitution. Additionally, Pitts contends that the November 4, 2008, election violated the requirements of the Elections Code. As a result of these alleged constitutional and statutory violations, Pitts argues, the election violates the judgment and the settlement in the *Oronoz/Pitts* class action because it was not conducted pursuant to applicable law.

The County argues that Measure U did not violate the voters' due process or free speech rights, Proposition 218 or the Elections Code. Additionally, the County contends Pitts is barred by the doctrines of waiver and judicial estoppel from challenging Measure U.

9

## DISCUSSION

1.  *Pitts is Barred by the Long Form Settlement Agreement from Challenging the 2008 UUT*

"Waiver is the intentional relinquishment of a known right." (*Branson v. Sharp Healthcare, Inc.* (2011) 193 Cal.App.4th 1467, 1478.) The trial court found that Pitts waived his right to challenge the 2008 UUT adopted by Measure U by executing the long form settlement agreement one day after the election. We agree that Pitts is barred by the long form settlement agreement from challenging the 2008 UUT.

A trial court's determination of waiver is generally a question of fact. (*St. Agnes Medical Center v. PacifiCare of California* (2003) 31 Cal.4th 1187, 1196.) We must affirm a waiver finding if it is supported by substantial evidence. (*Ibid.*) " 'When, however, the facts are undisputed and only one inference may reasonably be drawn, the issue is one of law and the reviewing court is not bound by the trial court's ruling.' " (*Ibid.*) Likewise, we independently interpret contracts, if the interpretation does not turn on the credibility of extrinsic evidence. (*Windsor Pacific LLC v. Samwood Co., Inc.* (2013) 213 Cal.App.4th 263, 273.)

"A settlement agreement is simply a contract." (*Hernandez v. Board of Education* (2004) 126 Cal.App.4th 1161, 1176 (*Hernandez*).) "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Civ. Code, § 1636.) When interpreting a written contract, we generally ascertain the intention of the parties from the writing alone, if possible. (Civ. Code, § 1639.) A contract, however, "may be explained by reference to the circumstances under which it was made, and the matter to which it relates." (Civ. Code, § 1647.)

Under the long form settlement agreement, Pitts "forever discharged" the County "from any and all Released Claims." "Released Claims" was defined by the agreement as including "any and all claims . . . and causes of action of every nature and description whatsoever, ascertained or unascertainied, suspected or unsuspected . . . of the Plaintiffs

and all Class Members that were *or could have been brought* against the County . . . in the Complaint, from the beginning of the Class Period [February 16, 2004] to November 4, 2008, arising from the facts alleged in the Complaint, including but not limited to charging, billing, or collection activity related to the UUT . . . based on the alleged failure to seek voter approval of the UUT and equal protection allegations raised in the Complaint." (Italics added.)

The trial court found that when Pitts signed the long term settlement agreement on November 5, 2008, "the events about which Pitts now complains had all occurred." The court continued: "These events were public. They were well known to Pitts and his counsel. Indeed, Pitts and his fellow plaintiffs had caused this November 4, 2008 election to occur by means of this very lawsuit. The County had sent the ballot booklet to the Pitts household. . . . This all happened before Pitts signed his November 5, 2008 settlement." There was substantial evidence to support these factual findings, and Pitts does not dispute them on appeal.

In light of these undisputed facts, we conclude that prior to executing the long form settlement agreement, Pitts "could have brought" against the County the very same substantive claims he now asserts. Accordingly, Pitts is barred by the long form settlement agreement from pursuing his current challenge to Measure U and the 2008 UUT.

Although Pitts attempts to draw a sharp distinction between the 1991 UUT and the 2008 UUT approved in the election, the long form settlement agreement stated that the purpose of the election was to "validate" the UUT. Moreover, Pitt's current substantive claims arise from the same basic grievance he asserted in his pleadings, namely that the UUT is unlawful because it was not approved by the voters. He contends that the 1991 UUT was unlawful because there was no election at all, while the 2008 UUT is unlawful because the election violated certain constitutional and statutory requirements.

11

When the long form settlement agreement is read in its entirety and placed into context, it is clear that the County agreed to make tens of millions of dollars in payments and to hold an election to validate the 1991 UUT, as modified, in order to resolve *all* claims regarding the alleged unlawful nature of the tax. It is also clear that Pitts and the other *Oronoz/Pitts* plaintiffs understood that the settlement resolved all of their potential claims against the County. On the first page of the long form settlement agreement, for example, it states that plaintiffs and their lawyers believe it is in the best interests of all class members "to resolve *finally* and *completely* the *potential* claims of the Plaintiffs and the Class Members against the County at this time by this Settlement." (Italics added.) In other words, the County settled the case to buy peace. It is unimaginable that the County would have executed the long form settlement agreement on the day of the election, as it did, if it knew that Pitts could challenge the 2008 UUT based on facts that already existed at the time.

Pitts argues that because the long form settlement agreement requires the County hold an election "pursuant to applicable law," he did not release the County from unlawful elections practices. This claim rings hollow because he knew, or should have known, all of the alleged deficiencies in the election at the time he signed the agreement.

Pitts argues that he is not barred from challenging Measure U because he signed the long form settlement agreement on behalf of the 1991 UUT taxpayers, not on behalf of the 2008 UUT taxpayers. This argument proves too much. We agree that Pitts executed the agreement on behalf of the 1991 UUT taxpayers and that the 2008 UUT taxpayers are not parties to the contract.[6] Pitts, however, seeks to enforce the long form settlement agreement pursuant to Code of Civil Procedure section 664.6, which "grants *the parties* a streamlined procedure to enforce an agreement they made between themselves." (*Hernandez*, *supra*, 126 Cal.App.4th at p. 1175.) Pitts thus cannot enforce

---

[6]     The "Settlement Class" was defined to mean all taxpayers who paid the UUT from February 16, 2004 to November 4, 2008.

the long term settlement agreement on behalf of the 2008 UUT taxpayers because they are not parties to the contract.

Pitts argues that because the short form settlement agreement required his attorneys to "cooperate with the County in seeking voter approval of the UUT," he was precluded from raising objections to Measure U prior to the election. We disagree. Nothing in the short form settlement agreement prohibited Pitts or his counsel from objecting to ballot materials on the grounds that they allegedly violated the constitutional and statutory rights of the voters.

Finally, Pitts makes two almost incomprehensible arguments regarding the long form settlement agreement. Pitts contends that "the settlement had to have been enforceable at the time the rights were waived by the party who allegedly waived those legal rights." He also argues at length that both the settlement agreement and the judgment were not enforceable at the time of the election. Pitts seems to be arguing that because the trial court had not approved the long form settlement agreement and entered judgment as of the date of the election, he is not bound by the release provisions in the contract. He does not and cannot, however, cite any relevant authority to support his position.

We reject all of Pitts's arguments regarding the long form settlement agreement. Pitts is barred by the agreement from challenging Measure U.

2. *Pitts is Judicially Estopped from Challenging the 2008 UUT*

a. *Standard of Review*

We review the findings of fact upon which the application of judicial estoppel is based under the substantial evidence test. (*Blix Street Records, Inc. v.* Cassidy (2010) 191 Cal.App.4th 39, 46 (*Blix*).) When the facts are undisputed, we independently review whether the elements of judicial estoppel have been satisfied. (*Ibid.*) Whether the doctrine should be applied even if the necessary elements are satisfied is a matter within the discretion of the trial court, which we review under the abuse of discretion standard. (*Id.* at pp. 46-47.)

13

b.  *Applicable Legal and Equitable Principles*

Judicial estoppel is an equitable doctrine designed to maintain the integrity of the courts and to protect the parties from unfair strategies.  (*MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co., Inc.* (2005) 36 Cal.4th 412, 422; *Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 181 (*Jackson*).)  The doctrine prohibits a party from asserting a position in a legal proceeding that is contrary to a position he or she successfully asserted in the same or some earlier proceeding.  (*Blix*, *supra*, 191 Cal.App.4th at p. 47; *Jackson*, at p. 181.)

 "This doctrine rests on the principle that litigation is not a war game unmoored from conceptions of ethics, truth, and justice.  It is quite the reverse.  Our adversarial system limits the affirmative duties owed by an advocate to his adversary, but that does not mean it frees him to deceive courts, argue out of both sides of his mouth, fabricate facts and rules of law, or seek affirmatively to obscure the relevant issues and considerations behind a smokescreen of self-contradictions and opportunistic flip-flops."  (*Ferraro v. Camarlinghi* (2008) 161 Cal.App.4th 509, 558.)

The elements of judicial estoppel are "(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake."  (*Jackson*, *supra*, 60 Cal.App.4th at p. 183; accord *Aguilar v. Lerner* (2004) 32 Cal.4th 974, 986-987 [quoting *Jackson*].)  Even if the necessary elements of judicial estoppel are satisfied, the trial court still has discretion to not apply the doctrine.  (*Blix*, *supra*, 191 Cal.App.4th at pp. 46-47.)

c.  *The Trial Court Did Not Abuse Its Discretion in Applying Judicial Estoppel in This Case*

Each of the elements of judicial estoppel is satisfied in this case.  First, Pitts took two different positions regarding Measure U.  Before the trial court approved the

14

settlement and entered judgment, Pitts championed the benefits of Measure U to the voters. He argued that the settlement provided the non-monetary benefit of vindicating the taxpayers' "right to vote." The benefit of holding the election, according to Pitts, was "[p]riceless." Pitts's lead counsel, too, boasted of the benefits of the election, stating under oath that he would not have approved the settlement if the County had not agreed to the election.

After the trial court approved the settlement and entered judgment, however, Pitts changed his tune. He argued, in essence, that Measure U was a sham because of the County's alleged misrepresentations to the voters and other wrongdoing. According to Pitts, the County's misconduct was so egregious that the voters' constitutional rights were violated and the election should be overturned.

Pitts asserted both of his inconsistent positions in judicial proceedings, namely in the proceedings in the superior court in the *Oronoz/Pitts* class action. Further, he was successful in asserting his first position. Based in part on his arguments regarding the value of the election, the trial court approved the settlement, awarded Pitts $10,000, and awarded his attorneys about $7.6 million in fees.

The two positions Pitts took were totally inconsistent. The election cannot at the same time be a priceless benefit to the voters and a sham that deprived them of due process.

Finally, Pitts did not take his first position as a result of ignorance, fraud or mistake. Pitts knew all of the facts he now claims made the election a sham when he claimed the election was a priceless benefit to the voters.

Having determined that the elements of judicial estoppel have been satisfied, we must decide whether the trial court abused its discretion in applying the doctrine under the particular facts and circumstances of this case. This is not a difficult decision. Pitts's attempt to revive his action against the County is exactly the kind of litigation conduct judicial estoppel is meant to prevent. When it suited their interests, Pitts and class counsel championed the election that had already taken place. After securing millions of

15

dollars in payments from the County, they attacked the election as an affront to the constitutional rights of the class they represent. We have no trouble concluding that the trial court acted well within its discretion in applying the doctrine of judicial estoppel.

       3.     *The Substantive Challenges to Measure U and the 2008 UUT by Pitts, Owens and Munoz Are Meritless*

Even if Pitts's substantive claims were not barred by the long form settlement agreement and the doctrine of judicial estoppel, we would reject them on the merits. Pitts, Owens and Munoz argue that the 2008 UUT is unlawful because Measure U violated (a) the voters' due process rights, (b) the voters' free speech rights, and (c) Proposition 218. Additionally, Pitts contends that the November 4, 2008, election violated various provisions of the Election Codes. Each one of these substantive claims raises questions of law we review de novo. (*Greene v. Marin County Flood Control & Water Conservation Dist.* (2010) 49 Cal.4th 277, 287.)

       a.     *The Ballot Materials Did Not Violate the Voters' Due Process Rights*

Appellants argue that the ballot materials for Measure U were so misleading and deceptive, they violated the voters' due process rights. Generally, a challenge to ballot materials must be made before an election. Indeed, a postelection challenge to ballot materials is not permitted by the Elections Code. (See *Kerr*, *supra*, 106 Cal.App.4th at pp. 932-934; accord *Horwath*, *supra*, 212 Cal.App.3d at p. 773 [there is no statutory basis for attacking the postelection effects of the ballot materials]; *Friends of Sierra Madre v. City of Sierra Madre* (2001) 25 Cal.4th 165, 193-194 [citing *Horwath* with approval].)

Although the California appellate courts have recognized the "possibility" that an impartial analysis of a county measure or other ballot materials can be so misleading and inaccurate "that constitutional due process requires invalidation of the election" (*Kerr*,

16

*supra*, 106 Cal.App.4th at pp. 919, 934), no California appellate court, to our knowledge, has invalidated an election on this basis.[7]

The courts have set a "very high" bar (*Kerr*, *supra*, 106 Cal.App.4th at p. 934) for litigants to successfully mount a postelection due process challenge to a ballot measure for good reason. The trial court in this case aptly explained: "California law makes it hard to overturn elections. The reasons are fundamental. Voters, not judges, mainly run our democracy. It would threaten that core tenet if one person who did not like the election result could hire lawyers and with ease could invalidate an expression of popular will."

In *Horwath*, the principal case upon which appellants rely, the court set forth the parameters of a due process analysis. The court stated: "Determination of how much process is due in a local, direct decisionmaking context–where the complained-of irregularities consist of omissions, inaccuracies or misleading statements in the ballot materials—will depend on whether the materials, in light of other circumstances of the election, were so inaccurate or misleading as to prevent the voters from making informed choices. In conducting this inquiry courts should examine the extent of preelection publicity, canvassing and other informational activities, as well as the substance or content of such efforts. The ready availability of the text of the ordinance, or the official dissemination and content of other related materials, such as arguments for or against the measure, will also bear on whether the statutory noncompliance rendered the election unfair. Finally, courts should take into account the materiality of the omission or other informational deficiency. Flaws striking at the very nature and purpose of the legislation are more serious than other, more ancillary matters." (*Horwath*, *supra*, 212 Cal.App.3d at pp. 777-778.)

---

[7]    Owens and Munoz's reliance on *Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805 (*Calfarm*) is unpersuasive. The *Calfarm* decision did not address the issue of whether ballot materials were so misleading that they violated the voters' due process rights.

In *Horwath*, a measure authorizing a city rent control ordinance was placed on the ballot. The ordinance set a new "base rent" in the city's rent control scheme, which "resulted in an 8 percent rent rollback." (*Horwath*, *supra*, 212 Cal.App.3d at p. 770.) The ballot materials, however, did not discuss the rent rollback. (*Ibid.*) Further, the voter information pamphlet did not contain the actual text of the measure, though voters could request a copy of it by mail. (*Id.* at pp. 770-771.)

The court concluded that the city attorney violated a statute requiring an impartial analysis of the measure. (*Horwath*, *supra,* 212 Cal.App.3d at p. 778.) It also concluded, however, that the omission of a definition of the lawful base rent on the ballot materials fell "somewhere in between a minimal defect and one going to the core character and purpose of the proposed legislation." (*Id.* at p. 779.) In light of general disclosures in the ballot materials regarding nature of the ordinance, the preelection publicity on the rent rollback, and the availability of the full text of the proposed ordinance, the court held that the city's misconduct did not violate the voters' due process rights. (*Ibid.*)

Turning to the present case, the alleged deficiencies in the ballot materials relating to Measure U do not even rise to the level of a "minimal defect" contemplated by *Horwath*. Appellants argue that the title "Tax Continuation Measure" on the ballot was a misleading description of Measure U because the County created the false impression that the 1991 UUT was lawfully enacted. We disagree. Nowhere on the ballot does it state that the 1991 UUT was lawful. Further, it is objectively correct that a UUT had been imposed without interruption on the taxpayers since 1991, and that passage of Measure U would continue that tax, albeit in modified form.

Next, appellants contend that the County misled the voters by falsely stating in the ballot materials "that a 'yes' vote would result in a tax reduction." We reject this argument. The summary of the measure on the ballot and the impartial analysis accurately stated that the tax *rate* would decrease. The opposition argument to Measure U stated that while the tax rate would decrease, "so many more services would be taxed, the overall amount people will pay <u>will go up</u>." In a preelection editorial, the Los

18

Angeles Times noted that the main argument against Measure U was that it would "result in a tax increase for more than 1 million residents of unincorporated areas." The voters thus were not misled by the ballot materials regarding a "tax reduction."

Appellants contend that the summary and impartial analysis of Measure U falsely stated that the UUT would fund essential services, including those related to sheriff's deputies, parks, libraries, and street repairs. Nothing in the record, however, indicates this statement is inaccurate.

Appellants also argue that the County failed to inform the voters about a number of facts and circumstances relating to Measure U, including (1) the 1991 UUT had never been approved by the voters and was unlawful, (2) "new taxes" would be enacted by Measure U, (3) a "no" vote would "eliminate" the UUT and prevent the imposition of a $65 million per year tax, and (4) a "no" vote was a vote for $25 million in refunds. The County, however, was not required to state any of these things in the summary of the measure or in the impartial analysis.

The County, through its counsel, was required to provide an *impartial* title and summary of the purpose of the measure (Elec. Code, § 9105, subd. (a)), as well as a separate *impartial* analysis showing the effect of the measure. (Elec. Code, § 9160, subd. (b).) It was not required to inform the voters of all of the *arguments* against the measure. That task fell to the opponents of the measure, who informed the voters of many of the arguments appellants claim the County concealed. For example, the argument against Measure U in the ballot materials stated that the County was proposing a "new tax."

Further, both the County's summary of the measure and impartial analysis could not exceed 500 words. (Elec. Code, §§ 9105, subd. (a) & 9160, subd. (b).) This word limit precluded the County from discussing every issue relating to Measure U in the ballot materials. For voters interested in the details of the proposed tax, the County included in the ballot materials a redlined version of the Utility Users Tax Ordinance, showing the exact language of the proposed and then-existing ordinance. Where, as here,

19

the voters are provided the whole text of a proposed law or ordinance, we ordinarily assume the voters voted intelligently on the matter. (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 243-244.)

Additionally, the County was not required to inform the voters of the details of the settlement prior to the election.[8] It was possible at the time of the election that the court would reject the settlement. A disclosure of the many terms of the contingent settlement might have made the measure unnecessarily complicated and confusing.

In their many attacks on Measure U, appellants lose site of the very high bar they must clear to prevail on their respective due process claims. Appellants cannot prevail by merely showing that the County's impartial analysis (or summary of the measure) did not educate the electorate "as to all the legal nuances of the measure." (*Kerr*, *supra*, 106 Cal.App.4th at p. 934.) They must instead demonstrate that the ballot materials had "profoundly misled the electorate." (*Ibid.*) Appellants do not come close to meeting this standard. We therefore reject their due process claims.

        b.      *Measure U Did Not Violate the Voters' Rights to Free Speech and Free Elections*

Appellants argue that the ballot materials for Measure U violated their free speech rights under article I, section 2 , subdivision (a) of the California Constitution[9] and the First Amendment to the United States Constitution.[10] They fail to cite any evidence, however, that the ballot materials, or any act by the County, in any way prohibited

---

[8]     Contrary to appellants' contention, the public was not completely in the dark about the settlement. In an editorial dated July 18, 2008, the Los Angeles Times noted that the Board approved a settlement in the *Oronoz/Pitts* class action.

[9]     This provision states: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." (Cal. Const., art I, § 2, subd. (a).)

[10]     The First Amendment states: "Congress shall make no law . . . abridging the freedom of speech . . . ." (U.S. Const., 1st Amend.)

appellants from speaking or writing about any topic, including Measure U.  Appellants' contention that their free speech rights were violated is frivolous.

In support of their free speech arguments, appellants primarily rely on *Stanson v. Mott* (1976) 17 Cal.3d 206 (*Stanson*) and cases that cite or interpret that case.  The plaintiffs in *Stanson* sued a public official for allegedly unlawfully spending public funds to promote the passage of a bond issue.  (*Id.* at p. 209.)  The California Supreme Court recognized that the "the use of the public treasury to mount an election campaign" could violate the voters' right to a "free election" under former article II, section 2 of the California Constitution.[11]  (*Stanson*, at p. 218.)  The court then stated it did not need to resolve this "serious constitutional question" because the defendant did not have the statutory authority to spend public funds.  (*Id.* at pp. 219-220.)  Contrary to appellants' contention, however, the *Stanson* court did not discuss whether the voters' *free speech* rights were violated.

Our conclusion that appellants incorrectly characterized a *Stanson* claim as a free speech claim does not end our discussion of this matter.  We shall also discuss the merits of appellants' *Stanson* claim against the County.

In *Stanson*, the California Supreme Court set forth a distinction between a public agency's improper "campaign" expenditures and proper "informational" activities.  (*Stanson*, *supra*, 17 Cal.3d at p. 221.)  The court stated:  "[T]he use of public funds to purchase such items as bumper stickers, posters, advertising 'floats,' or television and radio 'spots' unquestionably constitutes improper campaign activity [citations], as does the dissemination, at the public expense, of campaign literature prepared by private proponents or opponents of a ballot measure."  (*Ibid.*)  "On the other hand," the court further stated, "it is generally accepted that a public agency pursues a proper

---

[11]    This provision, renumbered as article II, section 3 of the California Constitution (*East Bay Municipal Utility Dist. v. Appellate Department* (1979) 23 Cal.3d 839, 844, fn. 5), states:  "The Legislature shall define residence and provide for registration and free elections."  (Cal. Const., art. II, § 3, former art. II, § 2.)

'informational' role when it simply gives a 'fair presentation of the facts' in response to a citizen's request for information [citations] or, when requested by a public or private organization, it authorizes an agency employee to present the department's view of a ballot proposal at a meeting of such organization." (*Ibid.*)

The court also recognized that in some cases "the line between unauthorized campaign expenditures and authorized  informational activities is not so clear." (*Stanson*, *supra*, 17 Cal.3d at p. 222.)  "In such cases," the court stated, "the determination of the propriety or impropriety of the expenditure depends upon a careful consideration of such factors as the style, tenor and timing of the publication." (*Ibid.*)

In *Vargas v. City of Salinas* (2009) 46 Cal.4th 1 (*Vargas*), the California Supreme Court affirmed the distinction stated in *Stanson* regarding campaign and informational activities. (*Id.* at pp. 33-34.)  The court also clarified that "*Stanson* does not preclude a governmental entity from publicly expressing an opinion with regard to the merits of a proposed ballot measure, so long as it does not expend public funds to mount a campaign on the measure." (*Vargas*, at p. 36.)  "[U]pon reflection," the court further stated, "it is apparent that in many circumstances a public entity inevitably will 'take sides' on a ballot measure and not be 'neutral' with respect to its adoption." (*Ibid.*)

The court also stated that the "potential danger to the democratic electoral process" discussed in *Stanson* "is not presented when a public entity simply informs the public of its opinion on the merits of a pending ballot measure or of the impact on the entity that passage or defeat of the measure is likely to have.  Rather, the threat to the fairness of the electoral process to which *Stanson* referred arises when a public entity or public official is able to devote funds from the public treasury, or the publicly financed services of public employees, to *campaign activities* favoring or opposing such measure." (*Vargas*, *supra*, 46 Cal.4th at pp. 36-37.)

The measure at issue in *Vargas* was a proposal to reduce the UUT of the defendant city.  The city opposed the measure and produced various documents and reports, including a newsletter to city residents, indicating the services that would be cut if the

22

measure passed. (*Vargas*, *supra*, 46 Cal.4th at pp. 11-12, 20.) The plaintiffs claimed that the city improperly distributed "campaign materials." (*Id.* at p. 13.) The court, however, held that the city merely engaged in informational activity rather than campaign activity. (*Id.* at pp. 37-38.)

Here, appellants do not allege any facts indicating that the County spent public funds to engage in campaign activities in support of Measure U. For example, there is no allegation that the County purchased bumper stickers, posters, or television or radio advertisements to promote the measure. Further, the summary and impartial analysis of Measure U do not endorse the measure and, as we explained *ante*, are reasonably fair and accurate. Appellants thus cannot maintain a claim against the County under *Stanson* and *Vargas*.

c.       *Measure U Did Not Violate Proposition 218*

Adopted by California voters in November 1996, Proposition 218 added articles XIII C and XIII D to the California Constitution. Proposition 218 generally prohibits local governments from imposing taxes without voter approval. (*Schmeer v. County of Los Angeles* (2013) 213 Cal.App.4th 1310, 1319.)

Article XIII C, section 2, subdivision (c) of the California Constitution (Subdivision (c)) provides: "Any general tax imposed, extended, or increased, without voter approval, by any local government on or after January 1, 1995, and prior to the effective date of this article [November 6, 1996], shall continue to be imposed only if approved by a majority vote of the voters voting in an election on the issue of the imposition, which election shall be held within two years of the effective date of this article [November 6, 1998] and in compliance with subdivision (b)."

We shall refer to the period between January 1, 1995 and November 6, 1996, as the "window period." According to the Howard Jarvis Taxpayers Association, the sponsor of Proposition 218, "the window period provision was intended to discourage local taxing authorities from rushing to impose taxes after the ballot measure became public knowledge but before its enactment." (*McBrearty v. City of Brawley* (1997)

23

59 Cal.App.4th 1441, 1450 (*McBrearty*), disapproved on other grounds in *Howard Jarvis Taxpayers Assn. v. City of La Habra* (2001) 25 Cal.4th 809, 816 (*Howard Jarvis*).) We agree with this assessment of the purpose of the window period. (See *McBrearty*, at p. 1450 [adopting assessment of Howard Jarvis Taxpayers Association].)

Owens and Munoz argue that the 1991 UUT is "subject to the provisions of Subdivision (c) because it was 'imposed' on the Taxpayers [i.e., the class of taxpayers they purport to represent] between January 1, 1995, and November 6, 1996." They further contend that the 1991 UUT violates Proposition 218 because it was not approved by a majority of the voters prior to November 6, 1998.

Owens and Munoz, however, have no standing to challenge to the 1991 UUT. Their complaint alleges they represent all persons "living in and/or operating businesses in the unincorporated areas of Los Angeles County from November 4, 2008 to the present" who were charged the UUT "approved pursuant to the illegal November 4, 2008 election." Other parties, including Pitts, who represented the class of taxpayers who paid the 1991 UUT, settled all claims against the County arising from the alleged illegal nature of the tax. Accordingly, whether the 1991 UUT violated Proposition 218 is irrelevant to the class action lawsuit brought by Owens and Munoz.[12]

---

[12] Owens and Munoz argue that the 2008 UUT also violates Propositions 218 and 62 because it purports to continue an invalid tax. The only authority they cite to support this argument is *Silicon Valley Taxpayers' Assn., Inc. v. Santa Clara County Open Space Authority* (2008) 44 Cal.4th 431 (*Silicon Valley*), where the court stated "voter consent cannot convert an unconstitutional legislative assessment into a constitutional one." (*Id.* at p. 449.) This statement, however, is taken out of context. The court held that under Proposition 218 a local agency cannot impose a real property assessment unless (1) the tax is approved by a weighted majority of voters *and* (2) the agency clears certain "substantive hurdles" set forth in article XIII D, section 4 of the California Constitution. (*Silicon Valley*, at p. 449.) The court thus held that voter approval was insufficient to validate the assessment because the agency did not comply with additional, independent constitutional requirements. In the present case, by contrast, there were no substantive hurdles apart from voter approval that the County needed to clear in order to enact the 2008 UUT. *Silicon Valley* therefore is distinguishable.

In any case, the 1991 UUT did not violate Proposition 218. Proposition 218 requires local public entities "to obtain voter approval of general taxes *first imposed* or increased after January 1, 1995." (*Burbank-Glendale-Pasadena Airport Authority v. City of Burbank* (1998) 64 Cal.App.4th 1217, 1226, italics added; accord *Citizens Assn. of Sunset Beach v. Orange County Local Agency Formation Com.* (2012) 209 Cal.App.4th 1182, 1194 ["The word 'impose' usually refers to the first enactment of a tax"].) As stated *ante*, the purpose of the window period was to prevent taxing authorities from rushing to impose taxes after the ballot measure became public knowledge. Because the 1991 UUT was first imposed long before the window period, it was not subject to Proposition 218. (See *Batt v. City and County of San Francisco* (2010) 184 Cal.App.4th 163, 176 [tax already in place prior to adoption of Proposition 218 was not subject to Proposition 218].)

Owens and Munoz's reliance on *Howard Jarvis* is misplaced. There, the plaintiffs sued a city for allegedly imposing and collecting a UUT on its residents without the voter approval mandated by Proposition 62 (Gov. Code, §§ 53720-53730). (*Howard Jarvis*, *supra*, 25 Cal.4th at p. 812.) The issue was when the statute of limitations began to run. (*Ibid.*) The court held that "if, as alleged, the tax is illegal, its continued imposition and collection is an ongoing violation, upon which the limitations period begins anew with each collection." (*Ibid.*) The court did not, however, discuss the meaning of the term "impose" for purposes of Subdivision (c). *Howard Jarvis* thus does not hold that a tax first imposed prior to January 1, 1995, is subject to Proposition 218.

Pitts argues that the 2008 UUT violated Proposition 218 because the County did not state in the ballot materials that "Measure U would (1) enact, for the first time, a voter approved UUT and (2) would enact brand new taxes." Pitts confuses election due process requirements with the requirements of Proposition 218. Proposition 218 requires voter approval of new local government taxes. The County fully complied with Proposition 218 by holding an election on Measure U.

In his reply brief, Pitts argues that the 2008 UUT is a special tax and not a general tax. This is significant because a general tax can be imposed by a majority vote, while a special tax needs a two-thirds vote for approval. (Cal. Const., art. XIII C, § 2, subds. (c) & (d).) Pitts claims that the 2008 UUT is void because it was not approved by a two-thirds vote. He forfeited this argument, however, because he did not make it in his motion to enforce the settlement in the trial court or in his opening brief in this court. (*Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 767 [appellant waived issue he failed to raise in the trial court].)

Pitts, furthermore, does not have standing to pursue this argument. The judgment and the settlement agreement required the County to hold an election pursuant to applicable law, but stated nothing about interpreting the election results. Whether the 2008 UUT is a general or special tax is an issue relevant to interpreting the election results, not whether the election was held pursuant to applicable law. Pitts therefore cannot challenge the County's interpretation of the election results as part of his motion to enforce the settlement.

In any case, the 2008 UUT is not a special tax. A special tax "means any tax imposed for specific purposes, including a tax imposed for specific purposes, which is placed into a general fund." (Cal. Const., art. XIII C, § 1, subd. (d).) "The essence of a special tax 'is that its proceeds are earmarked or dedicated in some manner to a specific project or projects.' " (*Bay Area Cellular Telephone Co. v. City of Union City* (2008) 162 Cal.App.4th 686, 696.) Here, the proceeds of the 2008 UUT are deposited in the County's general fund, and are not earmarked for any specific project.[13] The 2008 UUT is therefore a general tax.

---

[13] Contrary to Pitts's argument, the ballot summary of Measure U did not indicate otherwise. The summary stated that the tax would fund "essential services, *including* sheriff's deputies, parks, libraries, street repairs, and *other general fund services*." (Italics added).

d. *Measure U Did Not Violate the Elections Code*

Pitts argues that the County violated Elections Code section 9105, subdivision (a), which requires County counsel to provide an "impartial statement of the purpose" of a proposed measure in a summary placed on the ballot. He also contends the County violated Elections Code section 9160, subdivision (b), which requires County counsel to provide an "impartial analysis of the measure showing the effect of the measure on the existing law and the operation of the measure."

In support of his position, Pitts essentially rehashes the same contentions he made in his due process claim. He contends, for example, that the measure title was misleading. He also contends that ballot materials were deceptive and unfair because they did not disclose the UUT was a "new tax" or that a "no" vote would have resulted in $25 million in tax refunds. For the reasons we explained *ante*, we hold that the ballot materials were reasonably fair and accurate. We therefore reject Pitts's claim that Measure U violated the Elections Code.

## DISPOSITION

The judgment dated May 12, 2012, in the *Owens* class action is affirmed. The order dated April 26, 2012, in the *Oronoz/Pitts* class action is affirmed. Respondent County of Los Angeles is awarded costs on appeal in both appeals.

**CERTIFIED FOR PUBLICATION**

KITCHING, J.

We concur:

KLEIN, P. J.

CROSKEY, J.

27