Filed 9/29/20  Santana v. FCA US, LLC CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JOSE SANTANA, | |
| Plaintiff and Respondent, | G057244, G058020 |
| v. | (Super. Ct. No. 30-2016-00882680) |
| FCA US, LLC, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Hugh Michael Brenner, Judge.  (Retired judge of the Orange Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed in part and reversed in part.

Hawkins Parnell & Young, Jeffrey T. Thayer; Gibson, Dunn & Crutcher, Thomas H. Dupree Jr., and Shaun A. Mathur for Defendant and Appellant.

Rosner, Barry & Babbitt, Hallen D. Rosner, Arlyn L. Escalante; Center for Constitutional Litigation, Robert Peck; O'Conner Law Group and Mark O'Connor for Plaintiff and Respondent.

\*          \*          \*

A jury held defendant FCA US, LLC (Chrysler) liable on three causes of action arising from plaintiff Jose Santana's defective vehicle: breach of the express and implied warranty under the Song-Beverly Consumer Warranty Act (Civ. Code, § 1790 et seq.; the Song-Beverly Act), and fraudulent concealment.[1] Santana's economic damages from violation of the express warranty under the Song-Beverly Act were $31,896.60 and the jury also imposed a civil penalty of $63,795.20 for the willful failure to repurchase or replace the vehicle. On the fraud claim, the jury awarded economic damages of $33,839.91, noneconomic damages of $100,000, and punitive damages of $1 million, resulting in a total verdict of $1,229,531.71. After an award of fees and costs, the total judgment amounted to $1,740,169.58.

Chrysler contends most of those damages must be vacated because there was no substantial evidence of fraudulent concealment. We agree. Santana's fraud theory was that Chrysler concealed an electrical defect in Santana's vehicle. But there was no evidence Chrysler was aware of the defect until after Santana purchased his vehicle, and thus no evidence that Chrysler concealed it. Because the fraud judgment must fall, the separate award of economic damages, the noneconomic damages, and the punitive damages fall with it.

Chrysler also contends there was no evidence of a willful violation of the Song-Beverly Act. We disagree with that contention and affirm that aspect of the judgment. By the time Chrysler's duty to repurchase arose, it was aware of the electrical defect in Santana's vehicle, which it chose not to repair adequately.

---

[1] The parties do not discuss the jury's verdict on the breach of implied warranty count. Accordingly, neither do we.

2

Finally, Chrysler contends the court erred in failing to apportion attorney fees and by doubling Santana's Lodestar calculation. We conclude the court did not abuse its discretion and thus affirm the fee award.

FACTS

*Santana's Vehicle*

Santana purchased a 2012 Dodge Durango in November 2011, for a total purchase price of $44,748. He purchased the "Citadel" model, which was the most luxurious version of the Durango. The vehicle came with a three-year, 36,000 mile bumper-to-bumper warranty, and a five-year, 100,000 mile power-train warranty.

Almost immediately, Santana experienced problems with the vehicle.

The first time Santana brought his vehicle in for repair was in June 2012 at 9,466 miles. The vehicle would not start. This would prove to be a recurring problem for Santana, who estimated that it occurred 10 times, a few of which required repairs at the dealer.

Santana's no-start problem was the central theme of the trial, so we pause to explain Santana's theory of what went wrong with his vehicle. Santana's expert generally attributed his no-start problem to a component called the Totally Integrated Power Module, or TIPM for short. The TIPM is an enclosed box in the engine compartment of the vehicle, which contains a circuit board and regulates power to most of the systems in the vehicle. The circuit board was covered with a conformal coating, which is a thin rubbery coating over the entirety of the circuit board, which is intended to protect it from dust and vibration, as well as to insulate it from heat. The TIPM's used by Chrysler were manufactured by a company called Continental, which is not a party to this lawsuit. The fuel pump electrical relay, which was attached to the circuit board, was built by NEC Components (also a nonparty). NEC warned against using a conformal coating

3

made of silicone because the heat from the circuit board can cause the silicone to emit gas, and the gas can enter the fuel-pump relay, which leads to failure of the relay, which, in turn, leads to stalling or a failure to start. At the time Santana purchased his vehicle, Continental was producing TIPMs with a silicone conformal coating. Santana's expert opined this was the root cause of many of Santana's problems.

While Santana attributed many of his problems to the TIPM, he experienced several other issues too. Santana's second repair visit was at 22,029 miles, in October 2013. The front suspension was shaking while the car was moving. The dealership balanced, rotated, and aligned the tires, but, according to Santana, the issue was never resolved. Instead, Santana bought a lifetime tire-balancing warranty from a tire store and had the tires balanced every time the shaking started up again.

In April 2014, at 28,047 miles, Santana brought the vehicle in to repair a problem with the seatbelt warning being too sensitive. Putting a telephone on the passenger seat would cause the fasten seatbelt alert to chime. Chrysler never fixed that problem. Santana ended up just buckling the seatbelt on the empty seat to work around it.

In May 2014, at 28,644 miles, Santana brought the vehicle in to repair the sun roof which had become inoperable. The dealership taught Santana a trick: All Santana needed to do was to turn the ignition on, open the door, and press the gas pedal three times. This trick would cause the computer to reset and the sunroof would work again. The issue was never fully resolved. Santana's expert attributed this problem to the TIPM.

In August 2014, at 30,262 miles, Santana had the vehicle towed to the dealership because it would not start. At this appointment, the dealership determined that the fuel pump relay in the TIPM was not receiving power, so they performed a so-called bridge operation. This involved adding an additional electrical relay, external to the TIPM, and rerouting the electricity to the fuel pump through the external relay.

4

Afterward, Santana arrived home and turned off his vehicle, but heard a hissing sound. He turned the vehicle back on and heard a mini explosion followed by a profusion of smoke from the exhaust pipe. As it turns out, the fuel pump was still on and pumping fuel even after the vehicle was turned off. He returned the vehicle to the dealership for the second time that day.

At the same visit, the vehicle's battery was found to be weak and in a failed state. It was replaced.

In December 2014, at 33,121 miles, Santana brought the vehicle in to repair squeaking noises coming from the front and rear of the vehicle. The dealership determined the rear shocks were weak and replaced them, and made some adjustments to hinges in the front.

In March 2015, at 37,179 miles, Santana brought the vehicle in to replace a defective front passenger seatbelt.

In April 2015, at 37,569 Santana brought the vehicle in to replace a defective driver's seatbelt.

At 38,157 miles, again in April 2015, Santana brought the vehicle in to address front suspension shimmying at highway speeds. According to Santana, this was never properly fixed.

In December 2015, at 43,462 miles, Santana brought the car in again to address a no-start issue. The problem stemmed from the WIN module (the wireless ignition), which was replaced.

In January 2016, at 44,467 miles, the seatbelt had malfunctioned for the third time.

That was the last straw for Santana and the point at which he contacted Chrysler to inquire about it buying back the vehicle. He explained to Chrysler customer service that he thought the vehicle was a "lemon" and wanted Chrysler to buy it back. After waiting on hold for 30 minutes, he was told that because the initial three-year,

5

36,000 mile warranty had expired, he did not qualify for a buyback. No one from Chrysler followed up with him. And Chrysler did not perform any further investigation to determine whether Santana qualified for a buyback.

In June 2016, at 49,408 miles, Santana had the vehicle towed into the dealership because, while driving on side streets, the dash board "lit up"—the temperature gauge spiked, the car stopped, and smoke came out from under the hood. The dealership replaced the radiator. At this point Santana felt his vehicle was a "ticking time bomb" and he purchased another vehicle, trading in his Durango for $20,000.

*History of Problems Related to the TIPM*

Chrysler experienced various problems related to the TIPM, which was first introduced in model year 2007 vehicles.

In July 2007, shortly after the introduction of the TIPM, Chrysler issued a recall due to stalling problems. Chrysler determined the problem was software related and the recall entailed reprogramming the software on the TIPM.

In November 2008, Chrysler staff prepared an "Issue Detail Report" noting that in the vehicle coded DS (which was a Dodge Ram truck), some vehicles (unclear how many) were experiencing a problem in which the TIPM failed to enter sleep mode when the vehicle was turned off. As a result, the vehicle was drawing too much power when not in use, resulting in premature battery failure. The TIPM in the Dodge Ram was a different configuration than the TIPM in the Durango.

In June 2009, a similar "Issue Detail Report" was prepared noting that the same vehicle ("DS") was experiencing a no-start failure due to low batteries. The batteries were low because the TIPM was experiencing a parasitic load—meaning an unintended draw of electricity—when the vehicle was not in operation, which drained the battery. Once again, there is nothing in the record to suggest how pervasive this problem was, but we note that Santana's vehicle's battery did fail prematurely.

6

Beginning in August 2009, as evidenced by a chain of internal Chrysler e-mails, problems were arising concerning a malfunctioning front blower for the air conditioning/heater. The record does not reveal the nature of the problem, how severe it was, or even what vehicles it affected. The subject of the e-mail chain was "TIPM Returns from safety office Weekly Meeting Agenda" so we can surmise it involved the TIPM. A solution was proposed in an attached document, which is not in our record. However, we can infer the solution from the e-mails we do have. A senior technical specialist wrote, "Ideas our team with Conti[nental] came up with to fix HVAC front blower issue. The one on page 10 is our choice. Our goal is to work with you to package both the relay (280 high current micro from OMRON) and the fuse (40 A Jcase) as a field fix and for 2010 V2 production." In response, another Chrysler employee wrote, "To add a wiring assembly with a stand alone relay and stand alone fuse can create quality issues. Please review other more feasible options to correct the HVAC front blower issue." Another Chrysler employee chimed in, "How about you fix the TIPM since it is the root cause of the failures???"

In January 2012, Chrysler prepared another "Issue Detail Report" describing a problem in which the sunroof stopped working. This condition was correlated with a blown fuse in the TIPM. Although the report pertained to vehicle "WK," which was the Jeep Cherokee, that vehicle contained the same TIPM as the Dodge Durango. Santana's vehicle also experienced a failed sunroof which his expert opined was caused by the TIPM.

In 2013, reports began accumulating of failures of the fuel pump electrical relay in the TIPM. In September of that year, one employee wrote an e-mail exclaiming, "What is going on with the '11 GC tipms? I have them coming out of the woodwork, one dealer got 4 calls today alone! [¶] Conditions is cold ambient crank no start, no fuel pump power to or out of pump fuse (internal relay), no DTC." "Mileages all in the 40-50k range (out of warranty, a $850 parts bill is hard to swallow). [¶] We are just starting

7

to get in the 40's now, so I think this may grow even bigger . . . ." A service support lead for Chrysler responded, "I can't comment on the TIPM quality issues, robustness of new parts, or availability. However, I do know there are techs out there using the attached repair procedure as a temporary work around to get cars back on the road. I don't bless this in any way, but it's a good MacGyver trick to get you out of a pinch if you need it." A Chrysler manager responded, "There is an issue with TIPM failure on the 2011 WK/WD[2] with the fuel pump relay. It was found that Conti[nental] was conformal coating the boards with a product containing silicon. The higher current draw for the fuel pump is shown to cause failure over time. This same conformal coating was used through March 2013. Service is running short on TIPMs, and several techs are coming up with alternate, unapproved work around methods. It has become a durability issue with vehicles coming in between 20-50k miles – many are out of warranty. There is a large usage in the field claiming no fuel pump power to or out of pump fuse (internal relay)." Another Chrysler employee responded, "This is going to get hot quick if we can't come up with something."

In a separate e-mail chain on August 30, 2013 involving different Chrysler employees around the same time, the bridge procedure was explained (apparently the bridge procedure performed on Santana's vehicle in August 2014), leading one Chrysler employee to respond, "The bypass is not recommended due to past issues." Another employee explained a safety flaw in the proposal: "I don't think this procedure is a good idea. The fuel pump relay is supposed to be controlled by the PCM so that in the case of an accident, the PCM can shut down the fuel pump. The proposal removes the PCM portion of the control." "Their proposal bypasses the PCM's control." Santana's expert explained, the fuel pump relay on the TIPM "is controlled by the computer, the PCM and power train control module. And in the event of a rollover, it shuts off the fuel pump. So

---

2       WD was an internal reference to the Dodge Durango.

if your car is in some sort of an accident, the fuel pump doesn't continue to pump." When asked whether Santana's vehicle still had that safety feature after the external fuel pump relay was added, Santana's expert testified, "No. That feature was not available at that point."

Around the same time as the above e-mails, Continental (the manufacturer of the TIPM) performed an experiment that proved the source of the problem was, in fact, the silicone conformal coating.[3] The experiment used three sets of TIPM modules, one set with the silicone conformal coating, one set with no conformal coating, and one set with a non-silicon based conformal coating. The circuit boards were subjected to specific heat and usage conditions. The modules with no conformal coating or a non-silicon based coating all saw fairly constant voltage drops across the relay contacts throughout the course of the experiment. The circuit boards with a silicon-based conformal coating, however, saw significant increases in voltage drops across the relay contacts as the experiment progressed. This was consistent with the hypothesis that heat was converting the silicone into a gaseous state and increasing the resistance across the contact points of the relay.

Almost a year later, in August 2014, an "Executive Review" presentation was prepared that explained and illustrated the magnitude of the problem. This presentation would have been given to high level executives at Chrysler. As a corrective action, the executive review recommended a bypass, or bridge procedure, similar to that performed on Santana's vehicle. There is nothing in the executive review about the potential safety problem associated with the bridge procedure.

---

[3] The findings were published internally by Continental in an undated document. However, the documents bear a 2013 copyright notice, and the results are first discussed internally at Chrysler in an e-mail dated August 2013, which describes the test as "recently conducted."

In December 2014, Chrysler instituted a safety recall for the Dodge Durango to implement the bridge procedure to install an external fuel pump relay. The recall notice says nothing about the potential safety liability of bypassing the internal TIPM relay.

Chrysler instituted a second recall in July 2015 related to the TIPM. Although that recall notice is not in our record, according to Santana's expert's testimony, it simply required technicians to inspect to ensure an external fuel pump relay was present, and, if not, to install it. This inspection was performed on Santana's vehicle.

Soon after Chrysler issued the second recall, the National Highway Traffic Safety Administration (NHTSA) completed its own study of the issue. The Center for Auto Safety had petitioned NHTSA to "initiate a safety defect investigation into alleged failures" of the TIPM installed in certain vehicles, including the Dodge Durango, "beginning in the 2007 model year." In response to the petition, NHTSA reviewed customer complaints and reports, as well as documents concerning the design and manufacture of the TIPM.

In July 2015, NHTSA denied the petition, concluding that further investigation was not warranted. The safety agency explained that the stall and no-start problem "ha[d] been addressed by [Chrysler's] safety recalls" and concluded further investigation was unlikely to be fruitful. However, it cautioned that "[t]his action does not constitute a finding by NHTSA that a safety-related defect does not exist."

In October 2016, Santana filed the underlying complaint, asserting causes of action for breach of express warranty (Song-Beverly Act), breach of implied warranty (Song-Beverly Act), fraudulent inducement by concealment, and negligent repair. Only the first three causes of action were brought to trial.

The jury found in favor of Santana on all three causes of action. It awarded economic damages of $31,896.60 on the express warranty claim under the Song-Beverly Act, $33,839.91 on the implied warranty claim under the Song-Beverly Act, additional

10

economic damages of $33,839.91 on the fraud claim, and noneconomic damages on the fraud claim of $100,000. It found Chrysler violated the Song-Beverly Act willfully and imposed a civil penalty of $63,795.20. Additionally, the jury imposed punitive damages in the amount of $1 million on the fraud claim. The total verdict amounted to $1,229,531.71. Afterward, Chrysler moved for a new trial and for judgment notwithstanding the verdict, both of which were denied. Santana subsequently moved for his attorney fees, seeking a lodestar amount of $235,553.50 and a multiplier of 2.5. The court granted the motion, accepted Santana's lodestar amount, and employed a 2.0 multiplier for a total award (including costs) of $510,637.87. The total judgment amounted to $1,740,169.58. Chrysler timely appealed.

DISCUSSION

*Fraudulent Concealment*

Chrysler contends there was no substantial evidence of fraudulent concealment. We agree.

Santana's theory at trial was that, *at the time he purchased the vehicle*, Chrysler fraudulently concealed material information, i.e., that the vehicle contained a defective TIPM. Thus, the jury was instructed, "Jose Santana relied on [Chrysler's] concealment if, 1, the concealment substantially influenced him to purchase or continue to own the 2012 Dodge Durango; *and* 2, he would probably not have bought the 2012 Dodge Durango without the concealment." (Italics added.) Further, on the verdict form, the jury found that Chrysler "intentionally fail[ed] to disclose facts that Jose Santana did not know and could not reasonably have discovered *prior to his purchase* of the 2012 Dodge Durango." (Italics added.) Santana purchased his vehicle in November 2011.

11

The focus of our inquiry, therefore, is what the evidence disclosed regarding Chrysler's knowledge of the defect prior to November 2011.

The sum total of the evidence on that front is the following: a publicly disclosed 2007 recall related to a software problem that apparently was fixed; an issue that cropped up in 2008 and 2009, with an unknown frequency, in a different vehicle, where a TIPM was drawing too much power when the vehicle was not in use; and a 2009 internal e-mail exchange regarding the heating and air conditioning front blower in some vehicle that occurred some amount of times that had something to do with a relay in a TIPM. All the other evidence post-dates the critical time period, which is pre-November 2011.

That is not enough. The very existence of a warranty presupposes that some defects may occur. Thus, the occurrence of a few defects that, so far as the record reveals, were all fixable, and mostly involved vehicles Santana did not own, is not enough to demonstrate an intent to conceal a defect in the TIPM. Santana would need evidence that, prior to Santana's purchase of the vehicle, Chrysler was aware of a defect in the TIPM that it was either unwilling or unable to fix. There was no such evidence.[4]

---

[4] Two federal district courts that addressed the exact same TIPM defect came to the same conclusion we reach. (*Base v. FCA US LLC* (N.D.Cal., Mar. 11, 2019, No. 17-CV-01532-JCS) 2019 U.S. Dist. Lexis 38895; *Dienes v. FCA US LLC* (S.D.Cal., Mar. 12, 2018, No. 16-CV-1812-AJB-BGS) 2018 U.S. Dist. 40226.) A third federal district court case, *Cieslikowski v. Fiat Chrysler* (C.D.Cal., Feb. 4, 2019, No. ED CV 17-562 MRW) 2019 U.S. Dist Lexis 40665, reached the same conclusion we do as well. However, that decision was recently reversed by the Ninth Circuit in an unpublished memorandum opinion. (See *Cieslikowski v. FCA US LLC* (9th Cir., June 12, 2020, No. 19-55679) 2020 U.S. Lexis 18707.) The Ninth Circuit opinion made no effort to highlight the evidence that the court felt was substantial, and thus we do not find it persuasive.

Because we reverse the judgment as to the fraud cause of action, the compensatory damage award for fraud, the noneconomic damages, and punitive damages (all of which were predicated on fraud) must also be reversed.

*Willful Violation of the Song-Beverly Act*

Next, Chrysler contends there was no substantial evidence to support the jury's finding that it willfully violated the Song-Beverly Act. To be clear, Chrysler does not dispute the jury's finding that it violated the Song-Beverly Act. It disputes only the jury's finding that it did so willfully. "Whether a manufacturer willfully violated its obligation to repair the car or refund the purchase price is a factual question for the jury that will not be disturbed on appeal if supported by substantial evidence." (*Oregel v. American Isuzu Motors, Inc.* (2001) 90 Cal.App.4th 1094, 1104.) We conclude the evidence supports the verdict.

"The [Song-Beverly Act] provides enhanced remedies to consumers who buy new consumer goods accompanied by a manufacturer's express warranty." (*Kiluk v. Mercedes-Benz USA, LLC* (2019) 43 Cal.App.5th 334, 336.) "Where . . . service or repair of the goods is necessary because they do not conform with the applicable express warranties, service and repair shall be commenced within a reasonable time by the manufacturer . . . ." (Civ. Code, § 1793.2, subd. (b).) "If the manufacturer . . . is unable to service or repair a new motor vehicle . . . to conform to the applicable express warranties after a reasonable number of attempts, the manufacturer shall either promptly replace the new motor vehicle . . . or promptly make restitution to the buyer . . . ." (*Id*., subd. (d)(2).) "If the buyer establishes that the failure to comply was willful, the judgment may include, in addition to the amounts recovered under subdivision (a), a civil penalty which shall not exceed two times the amount of actual damages." (§ 1794, subd. (c).)

13

There is a critical difference between Santana's fraud claim and his claim for a willful violation of the Song-Beverly Act: the relevant time frame. Whereas the fraud claim depended on evidence prior to Santana's purchase, the Song-Beverly Act claim depends on evidence during the warranty period.

Here, there was evidence to support a finding that Chrysler's "repair" of the faulty fuel pump relay was intentionally inadequate during the warranty period. Specifically, the bridge operation solved one problem—stalling or failing to start—only to introduce a new defect: the inability of the fuel pump to shut off in the event of an accident. Contemporaneous internal e-mails demonstrated that Chrysler was aware of the problem. And Santana's expert testified there was no evidence that Chrysler's recall procedure ever accounted for the new risk, and that, in fact, Santana's vehicle was left with the new defect after the bridge operation. Although Chrysler did not include the actual warranty in our record, presumably it requires a repair that restores full functionality, not a "MacGyver" half measure that simply swaps defects. From this evidence, the jury could infer that Chrysler intentionally chose not fully to honor the express warranty, which is sufficient to support a civil penalty under Civil Code section 1794, subdivision (c).[5]

Chrysler offers two arguments for why it should not be subject to a civil penalty.

---

[5] There was some evidence that an engineer working on a temporary fix for the fuel pump relay was aware of the need to wire the relay in such a way as to ensure safety features were maintained. But there was no evidence that this was actually implemented, and substantial evidence supported the conclusion that the bridge operation did not mitigate the safety risk. Because we must resolve any factual conflicts in favor of the judgment, we conclude the safety feature was not implemented in the repair of Santana's vehicle.

14

First, it asserts that because Santana requested repurchase after the expiration of his three-year, 36,000 mile warranty, and because Chrysler refused to purchase his vehicle on that ground, the refusal was in good faith. Chrysler cites an unpublished federal district court case that agreed with this argument. The argument is easily met, however. A manufacturer's duty to repurchase a vehicle does not depend on a consumer's request, but instead arises as soon as the manufacturer fails to comply with the warranty within a reasonable time. (*Krotin v. Porsche Cars North America, Inc.* (1995) 38 Cal.App.4th 294, 301-302.) Chrysler performed the bridge operation on Santana's vehicle in August 2014 with 30,262 miles on the odometer—within the three-year, 36,000 mile warranty. The internal e-mails demonstrating Chrysler's awareness of the safety risks inherent in the bridge operation were sent in September 2013, and thus Chrysler was well aware of the problem when it performed the bridge operation on Santana's vehicle. Thus, Chrysler's duty to repurchase or provide restitution arose prior to the expiration of the three-year, 36,000 mile warranty. Moreover, although we do not have the actual five-year, 100,000 mile power train warranty in our record, Santana's expert testified that the no-start/stalling issues Santana experienced were within the scope of the power train warranty, which was still active when Santana requested repurchase in approximately January 2016, at 44,467 miles. Thus the premise of Chrysler's argument—that Santana's request for repurchase was outside the relevant warranty—is not only irrelevant, but wrong.

Chrysler's second argument is that its Code of Civil Procedure section 998 settlement offers in this litigation, in February 2017 and again in February 2018, satisfy its obligation to offer a repurchase. In light of our conclusion that Chrysler's decision not fully to honor the warranty occurred as early as 2013, however, a settlement offer in 2017 falls well short. Upon a vehicle manufacturer's failure to honor a warranty, the manufacturer must "promptly" make an offer of repurchase or restitution. (Civ. Code, § 1793.2, subd. (d)(2).) Not years later during litigation. In any event, the Code of Civil

15

Procedure section 998 offers were not in evidence before the jury, and thus Chrysler cannot rely on them here.[6]

*Attorney Fees*

Chrysler's final contention is that the court erred in two ways in making its award of attorney fees.  First, the court did not apportion fees between the fee claim (Song-Beverly Act) and the non-fee claim (fraud).  Second, the court erred in doubling Santana's lodestar calculation by double counting the contingent nature of Santana's representation (i.e., using that factor both to increase counsel's hourly rate and also to justify a multiplier), and by improperly relying on Santana's "excellent outcome."  On both counts, we review the court's order for abuse of discretion.  (*Bell v. Vista Unified School Dist.* (2000) 82 Cal.App.4th 672, 687 (*Bell*); *Graham v DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 581.)  """"A trial court's exercise of discretion is abused only when its ruling '"exceeds the bounds of reason, all of the circumstances before it being considered."""""  (*Bell*, at p. 687.)  Here, the court did not abuse its discretion.

At trial, Santana sought a lodestar amount of $235,553.50, based on an hourly rate of $650 per hour.  Santana sought a 2.5 multiplier.  The court accepted Santana's lodestar figure and granted a multiplier of 2.0.  The court refused to apportion fees between the Song-Beverly Act and the fraud causes of action, commenting, "This was one set of facts. . . .  The fact that there were two causes of action, . . . that's a tactic."

---

[6]     There is a line of federal district court cases that have accepted the argument that an offer to settle litigation can negate a finding of willfulness.  In those cases, however, the manufacturer was continuing to attempt to repair the vehicle when litigation started, and thus the offers were, arguably, prompt.  (*Hatami v. Kia Motors America, Inc.* (C.D.Cal., Apr. 20, 2009, No. SA CV 08-0226 DOC) 2009 U.S. Dist. Lexis 45514; *Base v. FCA US LLC* (N.D.Cal., Mar. 11, 2019, No. 17-CV-01532-JCS) 2019 U.S. Dist. Lexis 38895.)  We offer no opinion on whether those cases were correctly decided.  Here, the settlement offers came years after Chrysler made the decision to implement an inadequate repair of Santana's vehicle.

1. *Apportionment*

"When a cause of action for which attorney fees are provided by statute is joined with other causes of action for which attorney fees are not permitted, the prevailing party may recover only on the statutory cause of action." (*Akins v. Enterprise Rent-A-Car Co.* (2000) 79 Cal.App.4th 1127, 1133.) However, "[s]uch fees need not be apportioned when incurred for representation on an issue common to both causes of action in which fees are proper and those in which they are not." (*Bell*, *supra*, 82 Cal.App.4th at p. 687.) Moreover, "[a]pportionment is not required when the claims for relief are so intertwined that it would be impracticable, if not impossible, to separate the attorney's time into compensable and noncompensable units." (*Ibid.*) The trial court found the latter exception applied, describing the two causes of action—fraud and Song-Beverly Act—as encompassing "one set of facts." We agree.

As we have already pointed out, the principal distinction between the two causes of action was that the fraud claim required proof of what Chrysler knew prior to the sale of Santana's vehicle. But as we concluded above, there was very little evidence on that front. Instead, most of the evidence focused on whether there was a defect at all, and whether Chrysler knew about the defect—issues that are equally relevant to the fraud and Song-Beverly Act claim.

Chrysler makes no attempt to directly confront the trial court's conclusion that the two causes of action stem from a common set of facts. Instead, it contends Santana should be judicially estopped from arguing the two causes of action shared a common core of facts because, in a previous stage of the litigation, Santana insisted the causes of action were different. Specifically, when the parties were arguing over whether Chrysler could be subject to both a civil penalty and punitive damages, Santana argued, successfully, that "[t]he damages stem from two separate and distinct causes of action which are based upon different conduct, different facts and governed by different statutes,

17

laws, and legal standards. Two distinct duties are separately punishable arising from *different conduct*."

"The elements of judicial estoppel are '(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake.'" (*Owens v. County of Los Angeles* (2013) 220 Cal.App.4th 107, 121 (*Owens*).)

We decline to impose an estoppel. As a purely technical matter, arguing that the causes of action stem from different sorts of harm is a different matter than whether the causes of action share a common set of facts. In this case, for example, the existence of the TIPM defect is at the core of both causes of action, but neither harm stems from the defect per se. In the case of fraud, the harm stems from a deception. And in the case of the Song-Beverly Act, it stems from the failure to honor the warranty. Same essential facts. Different conduct gives rise to the harm.

But even if the elements of judicial estoppel were technically satisfied, the doctrine is, in the final analysis, an equitable one. (*Owens, supra,* 220 Cal.App.4th at p. 121.) And given that we are reversing the punitive damages award, we deem it to be inequitable to punish Santana for an argument he made—which has now been rendered unsuccessful—in favor of punitive damages.

Beyond the estoppel argument, Chrysler has not proposed any practical method of apportioning fees in this case. It has not, for example, identified any discrete portion of the litigation that was solely focused on fraud. Moreover, Chrysler's only proposals for how to apportion fees are unpersuasive: a 50 percent reduction in fees, calculated simply attributing half of the fees to each of two causes of action; or a 92 percent reduction in fees to reflect the fact that 92 percent of the damages were attributable to fraud. Unsurprisingly, Chrysler does not cite any authority for those

18

approaches, both of which are completely out of keeping with the principle of ensuring the prevailing party receives a full recovery of attorney fees on the fee-shifting cause of action. (*Akins v. Enterprise Rent–A–Car Co.*, *supra*, 79 Cal.App.4th at p. 1133.) Consequently, the court did not err in refusing to apportion fees.

### 2. *Multiplier*

Finally, Chrysler contends the court erred in two ways in applying a 2.0 multiplier to the lodestar. First, Chrysler contends the court relied on the contingent nature of the representation both in setting the lodestar hourly rate, and in justifying a multiplier—a prohibited double counting of the same factor. Second, the court relied in part on the excellent results Santana's counsel obtained, which, Chrysler contends, is only relevant in public-interest litigation.

The process of calculating attorney fees involves two steps. The first is to determine the lodestar: the number of hours reasonably expended multiplied by a reasonable hourly rate. (*Serrano v Priest* (1977) 20 Cal.3d 25, 48 (*Serrano III*).) Once the lodestar has been calculated, the second step is to apply any positive or negative multipliers. "The purpose of such adjustment is to fix a fee at the fair market value for the particular action. In effect, the court determines, retrospectively, whether the litigation involved a contingent risk or required extraordinary legal skill justifying augmentation of the unadorned lodestar in order to approximate the fair market rate for such services. The '"experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong."'" (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132 (*Ketchum*).)

19

Perhaps the most common multiplier applied, at least where a plaintiff prevails, is a modifier for the contingent nature of the representation. "Under our precedents, the unadorned lodestar reflects the general local hourly rate for a *fee-bearing case;* it does *not* include any compensation for contingent risk, extraordinary skill, or any other factors a trial court may consider under *Serrano III.* The adjustment to the lodestar figure, e.g., to provide a fee enhancement reflecting the risk that the attorney will not receive payment if the suit does not succeed, constitutes earned compensation; unlike a windfall, it is neither unexpected nor fortuitous. Rather, it is intended to approximate market-level compensation for such services, which typically includes a premium for the risk of nonpayment or delay in payment of attorney fees. In this case, for example, the lodestar was expressly based on the general local rate for legal services in a *noncontingent* matter, where a payment is certain regardless of outcome." (*Ketchum, supra,* 24 Cal.4th at p. 1138.)

This description of the rationale for a contingency modifier points to one of its principal restrictions: a court cannot rely on the contingent nature of the representation in both setting the lodestar amount *and* in later modifying the lodestar. (*Ketchum, supra,* 24 Cal.4th at p. 1138 ["We emphasize that when determining the appropriate enhancement, a trial court should not consider these factors to the extent they are already encompassed within the lodestar"].) This restriction applies to a contingency modifier the same as any other modifier. Thus in *Robertson v. Fleetwood Travel Trailers of California, Inc.* (2006) 144 Cal.App.4th 785 the court reversed a fee award where the court relied on the risk arising from a contingency arrangement in both setting the hourly rate and in subsequently modifying the lodestar. (*Id.* at p. 822.)

Chrysler contends the court committed the same error here, citing Santana's fee motion where his counsel argued for an hourly rate of $650, justifying that rate, in part, based on the risk of nonpayment arising from the contingent nature of the representation. But Chrysler fails to connect the dots. The *court* did not accept that

20

premise, but instead expressly rejected it. In commenting on the multiplier, the court stated, "This case was a very complex case, and, of course, there's the contingency element in this, too. To say that all those issues are swept up in a basic hourly fee, which is not an extraordinary, high hourly fee, certainly I think *that would be wrong*." (Italics added.) Elsewhere the court described the hourly rate as one "we see somewhat routinely." Thus the court did not include the contingency factor in setting the lodestar and was free to include it in setting the multiplier.

Next, Chrysler's argues the court erred in basing the 2.0 multiplier, in part, on the results Santana obtained because, according to Chrysler, results are only relevant in public-interest litigation. Chrysler points to the following comment by the court: "It was an excellent outcome, and that's part of it. But I really think the complexity of it and the fact that it's contingent, I think . . . it warrants a multiplier."

In support of its argument that only public-interest litigation can support a multiplier based on excellent results, Chrysler cites a series of cases in which courts awarded fees based on excellent results in public-interest litigation. (E.g. *Hogar Dulce Hogar v. Community. Development Com. of City of Escondido* (2007) 157 Cal.App.4th 1358 [nonprofit association awarded fees where it obtained long-term relief in its challenge to the manner in which redevelopment agency calculated its payment to housing fund for low- and moderate-income families]; *Feminist Women's Health Center v. Blythe* (1995) 32 Cal.App.4th 1641 [reproductive clinic secured an injunction to protect citizens' constitutional right to abortion].) The cases Chrysler cites, however, are inapposite, as none of them deal with a multiplier. Instead, they all address whether the plaintiff was entitled to fees under the private attorney general doctrine codified in Code of Civil Procedure section 1021.5, which permits fees where, inter alia, "a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons." Naturally, in that context, the benefits the plaintiff conferred on the public is of primary concern. But Santana did not seek fees under the private attorney

21

general doctrine and thus those cases have no application here. There is simply no authority for the proposition that excellent results may result in a multiplier only in public-interest cases.

Nor is there any good reason for such a restriction. The rationale for taking excellent results into account is that it tends to reflect a superior quality of representation. (*Graham v. DaimlerChrysler Corp.*, *supra*, 34 Cal.4th at p. 582 ["'The "results obtained" factor can properly be used to enhance a lodestar calculation where an exceptional effort produced an exceptional benefit'"].) Better attorneys command higher rates, which means a multiplier may be required accurately to compensate the attorney for the quality of work performed. (*See Perdue v. Kenny A. ex rel. Winn* (2010) 559 U.S. 542, 554 ["superior results are relevant only to the extent it can be shown that they are the result of superior attorney performance"].) That rationale applies to all manner of cases, not just public-interest litigation. The purpose of a multiplier is to capture the *market* value of the attorney's services, not the moral value. (*See PLCM Group, Inc. v Drexler* (2000) 22 Cal.4th 1084, 1095.) Accordingly, results obtained was a relevant consideration.

It is clear from the court's brief comments that the results played only a minor role in the court's decision to apply a multiplier; much greater emphasis was given to the complexity of the matter and the skill of the attorneys in mastering the technology. The court gave the appropriate weight to the excellent results obtained. We follow the counsel of our Supreme Court. The trial judge is in the best position to evaluate the value of Santana's counsel's services. (*Ketchum*, *supra*, 24 Cal.4th 1122, 1131-1132.) We are *not* convinced the trial court was clearly wrong, i.e., that its ruling exceeds the bounds of reason. Accordingly, there was no abuse of discretion.

22

DISPOSITION

The judgment is reversed as to the fraud cause of action and the punitive damages. The court is directed to enter judgment in favor of Chrysler on the fraud cause of action, thereby striking the additional economic damages of $33,839.91, the noneconomic damages of $100,000, and the punitive damages of $1 million. In all other respects, the judgment is affirmed. Chrysler shall recover its costs incurred on appeal.


IKOLA, J.

WE CONCUR:


MOORE, ACTING P. J.


ARONSON, J.