Filed 1/31/25

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| ALAMEDA COUNTY TAXPAYERS' ASSOCIATION et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> COUNTY OF ALAMEDA et al., <br><br> Defendants and Respondents. | A168775 <br><br> (Alameda County <br> Super. Ct. No. RG20085082) |

Plaintiffs the Alameda County Taxpayers' Association and certain individual and retail taxpayers (collectively, Association) raised numerous challenges to the validity of a sales tax adopted by voters in Alameda County (County). The trial court sustained demurrers without leave to amend as to all of the Association's challenges to the sales tax and issued judgment. In the published part of this opinion, we affirm the trial court's rulings on the merits upholding the tax. In the unpublished portion, we reject the County's motion to dismiss the appeal as untimely as well as the Association's challenges to certain procedural rulings made by the trial court.

---

[*] Pursuant to California Rules of Court, rules 8.1100, 8.1105(b), and 8.1110, this opinion is certified for publication with the exception of parts I and III of the Discussion.

1

BACKGROUND

In July 2020, the County's board of supervisors voted to submit to the electorate a measure to impose a half-cent sales tax for ten years (Measure W). In the November 2020 election, County voters approved Measure W by a simple majority.

In December 2020, the Association filed the underlying action alleging Measure W was invalid under multiple theories. The lawsuit also included two claims involving the November 2020 election but not challenging Measure W's validity.[1] In 2021 and 2022, the trial court sustained the County's demurrers without leave to amend as to all of the Association's claims challenging the validity of Measure W. In 2023, the trial court issued judgment as to these claims. This appeal followed.[2]

DISCUSSION

I.      *The County's Motion to Dismiss*

The County filed a motion to dismiss the Association's appeal as untimely. The parties agree that the governing statute requires a notice of appeal to be filed, as relevant here, "within 30 days after the notice of entry of the judgment." (Code Civ. Proc., § 870, subd. (b).)[3] The Association's notice of appeal was filed within 30 days after the notice of entry of the 2023 judgment.

---

[1] These claims were alleged against both the County and its registrar of voters.

[2] The Association filed a May 7, 2024 request for judicial notice. We grant this request as to the reporter's transcript of a hearing in a preelection case challenging the Measure W ballot materials, and we deny as irrelevant the request as to a video recording and transcript of a 2023 County board of supervisors hearing.

[3] All undesignated statutory references are to the Code of Civil Procedure.

2

The County argues the appeal is nonetheless untimely because the appealable order was not the 2023 judgment, but rather a 2022 order sustaining without leave to amend the County's demurrer as to all then-remaining claims challenging the validity of Measure W.  The County relies in part on cases saving premature appeals by treating an order constituting a final decision as an appealable final judgment.  (See, e.g., *Melton v. Boustred* (2010) 183 Cal.App.4th 521, 527, fn. 1 [" '[W]hen the trial court has sustained a demurrer to all of the complaint's causes of action, appellate courts may deem the order to incorporate a judgment of dismissal, since all that is left to make the order appealable is the formality of the entry of a dismissal order or judgment' "].)

A recent California Supreme Court decision, *Meinhardt v. City of Sunnyvale* (2024) 16 Cal.5th 643 (*Meinhardt*), involving an appeal in an administrative mandate proceeding, is directly relevant to the issue before us.[4]  "[T]he fact that an appellate court may preserve an appeal by deeming an order or other ruling to be a judgment does not necessarily mean the order or ruling *is* the judgment for all purposes, including commencing the time in which an appeal may be taken.  It is in the context of *preserving* the right to appeal that we have stated that an order or other ruling constitutes a judgment.  We are aware of no case of this court construing a court's ruling to be a judgment for the purpose of *dismissing* an appeal as untimely—in administrative mandate proceedings or otherwise—and we decline to do so here. [¶] Instead, we conclude that the time to appeal in administrative mandate proceedings begins with the entry of 'judgment' or service of notice of entry of 'judgment,' not with the filing of an 'order' or other ruling, or service of notice of filing of such a ruling, even where an appellate court

---

[4] *Meinhardt* issued after the County filed its motion to dismiss.

might deem such a ruling appealable in order to vindicate the right of appeal. This conclusion is consistent with the plain language of the relevant statutes and rules that contemplate the entry of a 'judgment,' and with ' "the well-established policy, based on the remedial character of the right of appeal, of according that right in doubtful cases 'when such can be accomplished without doing violence to applicable rules.' " ' [Citation.] [¶] Our conclusion is also consistent with the goal of providing clarity to litigants when it comes to jurisdictional deadlines." (*Meinhardt*, at pp. 657–658.)

*Meinhardt*'s reasoning applies equally here. Designating the 2023 judgment as the appealable order for purposes of calculating the time in which to file a notice of appeal, rather than the 2022 order sustaining the demurrer without leave to amend, is consistent with the plain language of the governing statute, the remedial character of the right to appeal, and the policy of providing clarity to litigants on jurisdictional time limits. The County's motion to dismiss is denied.[5]

II.    *Measure W*

The Association raises a number of challenges to the validity of Measure W. None are persuasive.

A.    *Propositions 13 and 218*

The Association argues Measure W is a special tax and therefore subject to the two-thirds voter approval requirements of Propositions 13 and 218. We disagree.

Proposition 13 added to the California Constitution article XIII A, section 4, which provides in relevant part: "Cities, Counties and special

---

[5] We deny the Association's December 6, 2023 request for judicial notice, filed in support of their opposition to the County's motion to dismiss, as unnecessary because the requested document is part of the record on appeal.

4

districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district." Proposition 218 added article XIII C, section 2, subdivision (d): "No local government may impose, extend, or increase any special tax unless and until that tax is submitted to the electorate and approved by a two-thirds vote." Proposition 218 also added the following definitions: " 'General tax' means any tax imposed for general governmental purposes" and " 'Special tax' means any tax imposed for specific purposes, including a tax imposed for specific purposes, which is placed into a general fund." (Cal. Const., art. XIII C, § 1, subds. (a) & (d).) "After the passage of Proposition 218, ' "[a] tax is general only when its revenues are placed into the general fund and are available for expenditure for any and all governmental purposes." ' " (*Johnson v. County of Mendocino* (2018) 25 Cal.App.5th 1017, 1027 (*Johnson*).) Conversely, "a tax is 'special' when ' "its proceeds are earmarked or dedicated in some manner to a specific project or projects." ' " (*Id.* at p. 1028.)

The text of Measure W provides that it "is enacted solely for general governmental purposes for the County and not for specific purposes. All of the proceeds from the tax imposed by this Chapter shall be placed in the County's general fund and used for purposes consistent with general fund expenditures of the County." (Alameda County Ord. Code, § 2.08.401.) Where, as here, "a tax is imposed by a general governmental entity such as a county and the revenue from that tax goes into a general fund *for general governmental purposes*, the tax is a general tax." (*Johnson, supra*, 25 Cal.App.5th at p. 1028.)

The Association argues Measure W is nonetheless a special tax. First, it contends the ballot materials and representations to voters by County officials indicated the proceeds of the tax would be used for homelessness

5

services.  "In interpreting an ordinance or a voter initiative, we rely on the same rules of statutory construction applicable to statutes.  [Citations.] [¶] 'The primary duty of a court when interpreting a statute is to give effect to the intent of the Legislature, so as to effectuate the purpose of the law. [Citation.]  To determine intent, courts turn first to the words themselves, giving them their ordinary and generally accepted meaning.  [Citation.]  If the language permits more than one reasonable interpretation, the court then looks to extrinsic aids, such as the object to be achieved and the evil to be remedied by the statute, the legislative history, public policy, and the statutory scheme of which the statute is a part.' " (*Woodland Park Management, LLC v. City of East Palo Alto Rent Stabilization Bd.* (2010) 181 Cal.App.4th 915, 919–920.)  The plain language of Measure W is not ambiguous as to the use of the tax proceeds: they "shall be placed in the County's general fund and used for purposes consistent with general fund expenditures of the County." (Alameda County Ord. Code, § 2.08.401.) Because the language does not permit more than one reasonable interpretation on this point, we do not consider the ballot materials or other legislative history in construing Measure W.[6]

The Association next focuses on the intent of the legislators who placed Measure W on the ballot, arguing that under *Rider v. County of San Diego* (1991) 1 Cal.4th 1 (*Rider*), the legislators' alleged intent to circumvent the requirements of Propositions 13 and 218 renders Measure W a special tax.[7] *Rider,* issued before Proposition 218 was adopted, considered a tax levied by a

---

[6] Even if we were to consider them, it would not assist the Association (see discussion *post*, part II.B.).

[7] It is unnecessary to summarize the factual allegations relating to intent to resolve the issue before us.

special, limited-purpose agency created to impose a tax for the construction and operation of county justice facilities. (*Rider*, at p. 9.) The Supreme Court first considered whether the agency was a " 'special district' " within the meaning of Proposition 13, which applies only to " 'Cities, Counties and special districts.' " (*Rider*, at pp. 10, 6.) Although a prior opinion of the Court held that "an agency lacking the power to impose a tax on real property could not be deemed a special district," *Rider* reasoned that strict adherence to this rule "would create a wide loophole in Proposition 13" by exempting even those agencies that were "purposefully formed for the sole purpose of circumventing [Proposition 13]." (*Id.* at pp. 7, 10.) To avoid this result, *Rider* held that special districts "include any local taxing agency created to raise funds for city or county purposes to replace revenues lost by reason of the restrictions of Proposition 13." (*Id.* at p. 11; accord, *Monterey Peninsula Taxpayers Assn. v. County of Monterey* (1992) 8 Cal.App.4th 1520, 1533 [applying *Rider* to find local agency "is a 'special district' within the meaning of [Proposition 13]"].) *Rider* separately considered whether the tax imposed was a special tax, concluding that it was despite its placement in the special district's general fund because "tax revenues are being collected for the *special* and *limited* governmental purposes of constructing and operating the County's justice facilities." (*Rider*, at p. 13; see also *id.* at p. 15 ["a 'special tax' is one levied to fund a specific governmental project or program"].)

  *Neecke v. City of Mill Valley* (1995) 39 Cal.App.4th 946 (*Neecke*) considered an argument like the Association's: that "*Rider* . . . established a test whereby the purpose for levying the tax is determinative. If the tax was levied for a special purpose, it is a special tax," even if the proceeds are placed in the municipality's general fund for general purposes. (*Neecke*, at p. 954.) *Neecke* concluded there was "nothing in [*Rider*] that requires . . . a court to

ascertain whether a tax, the proceeds of which are deposited in a city's general fund, was enacted in order to circumvent Proposition 13 and then (if the court concludes that it was) to invalidate the tax." (*Id.* at p. 958.) *Neecke* explained, "The essence of a special tax, as explained *both* in [a prior Supreme Court case] and *Rider*, is that its proceeds are earmarked or dedicated in some manner to a specific project or projects. As the Supreme Court in *Rider* explicitly recognized, the 'general funds' of a special purpose agency *must* be used for a special and limited purpose. Such is not the case with funds placed in a city's general fund, which are available for use for any of the city's legitimate functions and are allocated during the general budgeting process in light of changing priorities and conditions. Thus, there is no certainty that tax proceeds deposited in the general fund will be used for any specific project, although such a result indeed may have been the intention of the officials enacting the tax in question. [Citation.] This distinction underlies the majority opinion in *Rider*." (*Neecke*, at pp. 956–957.) *Neecke* also "observe[d] that to construe the 'special tax' portion of the *Rider* decision as . . . [the challenger] would have us do would violate the well-established rule that, except in certain 'rare circumstances' [citation], '. . . the validity of legislative acts must be measured by the terms of the legislation itself, and not by the motives of, or influences upon, the legislators who enacted the measure.' [Citations.] Although the *Rider* court apparently concluded that the potential threat to the legislative intent behind Proposition 13 posed by the establishment of 'special districts' constituted a 'rare circumstance' in which the general rule should be avoided, we are loath to extend such a 'rare' exception to the 'special tax' context when neither the language nor the logic of the Supreme Court's decision compels us to do so." (*Neecke*, at pp. 958–959.)

8

We agree with *Neecke*'s analysis, as other courts have before us. (See *Coleman v. County of Santa Clara* (1998) 64 Cal.App.4th 662, 672 (*Coleman*) ["*Neecke*'s analysis is persuasive, and we adopt it here. . . . Indeed, it seems irrational to subject two identical 'general fund' tax measures to different voter approval requirements because, in proposing them, elected city or county officials had specific projects in mind for one but not the other."]; accord, *Johnson, supra,* 25 Cal.App.5th at p. 1030.) The Association contends *Neecke* and *Coleman* are distinguishable because they did not apply Proposition 218. But, like *Johnson*, we reject this argument. "[T]he 'essence' of a special tax remains the same after the passage of Proposition 218: a tax is 'special' when ' "its proceeds are earmarked or dedicated in some manner to a specific project or projects" [citation].' [Citation.] Proposition 218 simply clarified that this rule applies even when the tax's proceeds are placed into a general fund. ([Cal. Const., a]rt. XIII C, § 1, subd. (d).) Consequently, after the passage of Proposition 218, the holdings in *Neecke* and *Coleman* remain the law: . . . when a tax is imposed by a general governmental entity such as a county and the revenue from that tax goes into a general fund *for general governmental purposes*, the tax is a general tax." (*Johnson, supra,* 25 Cal.App.5th at p. 1028.)

Finally, the Association argues the trial court abused its discretion in denying leave to amend. "[W]hen a complaint 'is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm.' [Citation.] ' "[T]he burden is on the plaintiff to demonstrate that the trial court abused its discretion. [Citations.] Plaintiff must show in what manner [it] can amend [its] complaint and how that amendment will change

9

the legal effect of [its] pleading." ' " (*Vann v. City and County of San Francisco* (2023) 97 Cal.App.5th 1013, 1020 (*Vann*).) The Association argues it can add allegations that public funds were improperly spent promoting Measure W, but fails to explain how any improper use of public funds could render Measure W a special tax. The Association also contends it can allege additional facts about the legislators' intent, including allegations about a voter survey conducted prior to Measure W's placement on the ballot. As explained above, the legislators' intent does not impact the determination of whether Measure W is a special or general tax. (See *Coleman, supra,* 64 Cal.App.4th at p. 672 [agreeing with *Neecke* that it is "unnecessary to consider the purposes behind enacting a tax that was destined for a general fund and available for general governmental purposes"].) Accordingly, the Association fails to demonstrate an abuse of discretion in denying leave to amend its claims under Propositions 13 and 218.

B.     *Ballot Materials*

The Association contends the trial court erred in sustaining the County's demurrer to its due process claim alleging the Measure W ballot materials were inaccurate and misleading. We reject the claim.[8]

The parties agree the controlling test is set forth in *Horwath v. City of East Palo Alto* (1989) 212 Cal.App.3d 766: "California courts recognize the general principle that an election cannot stand in the face of irregularity or illegality in the election process which affected the result—a departure from legal requirements that 'in fact prevented "the fair expression of popular will." ' [Citations.] This overriding principle . . . can be viewed as encompassing a concern about fundamental fairness or due process in the

_____

[8] We therefore need not decide whether, as the County argues, this claim is precluded by an unsuccessful preelection challenge brought by two individual County taxpayers who are also plaintiffs in the underlying action.

10

election procedures themselves." (*Id.* at pp. 775–776.) "Determination of how much process is due in a local, direct decisionmaking context—where the complained-of irregularities consist of omissions, inaccuracies or misleading statements in the ballot materials—will depend on whether the materials, in light of other circumstances of the election, were so inaccurate or misleading as to prevent the voters from making informed choices. In conducting this inquiry courts should examine the extent of preelection publicity, canvassing and other informational activities, as well as the substance or content of such efforts. The ready availability of the text of the ordinance, or the official dissemination and content of other related materials, such as arguments for or against the measure, will also bear on whether the statutory noncompliance rendered the election unfair. Finally, courts should take into account the materiality of the omission or other informational deficiency. Flaws striking at the very nature and purpose of the legislation are more serious than other, more ancillary matters." (*Id.* at pp. 777–778.)

The standard for such challenges is high. "Although the California appellate courts have recognized the 'possibility' that an impartial analysis of a county measure or other ballot materials can be so misleading and inaccurate 'that constitutional due process requires invalidation of the election' [citation], no California appellate court, to our knowledge, has invalidated an election on this basis. [¶] The courts have set a 'very high' bar [citation] for litigants to successfully mount a postelection due process challenge to a ballot measure . . . ." (*Owens v. County of Los Angeles* (2013) 220 Cal.App.4th 107, 123, fn. omitted (*Owens*).)

11

The Association's complaint relies on the ballot and campaign materials.[9] The ballot question for Measure W asked, "Shall a County of Alameda ordinance be adopted to establish a half percent sales tax for 10 years, to provide essential County services, including housing and services for those experiencing homelessness, mental health services, job training, social safety net and other general fund services, providing approximately $150,000,000 annually, with annual audits and citizen oversight?" The Association focuses on the list of identified County services, but ignores that the list concludes with "other general fund services." Similarly phrased ballot questions have been found to indicate a tax is not designated for special purposes. (*Owens*, *supra*, 220 Cal.App.4th at pp. 113, 131 & fn. 13 [ballot materials representing that a proposed tax would " 'continue funding essential services, including sheriff's deputies, parks, libraries, street repairs, and other general fund services' " "did not indicate" that tax proceeds were "earmarked for any specific project"]; *Johnson*, *supra*, 25 Cal.App.5th at pp. 1029, 1021 [ballot argument that proposed tax would provide " 'funding to *support general County services, including* public health, public safety, and environmental cleanup' " did not render tax a special tax because, "while the ballot argument listed some of the general services that could be funded, none of the funds were ' "earmarked or dedicated" ' to any specific project, but instead were intended to provide funding for *general* county services"].)

Moreover, other ballot materials unequivocally indicated the tax would be used for general fund purposes only. The County counsel's impartial analysis provided, "Per the Measure's ordinance, if approved, the tax will be

---

[9] To the extent the Association also relies on the alleged intent of County officials and official bodies to circumvent Propositions 13 and 218, it fails to explain how such intent impacted voters' ability to make an informed choice about Measure W.

used for purposes consistent with general fund expenditures of the County and the tax is enacted solely for general governmental purposes. The proceeds from the tax shall be placed in the County's general fund." Measure W's opponents vociferously argued the "tax will be put into the General Fund to be spent on ANYTHING," and the measure was "**a $1.5 Billion 'Blank Check.'**" Alameda County Supervisors can spend *all* $1,500,000,000.00 *any* way *they* want. We decoded the legalese: Measure W 'is enacted *solely* for general governmental purposes and not for specific purposes. *All* of the proceeds from the tax . . . shall be placed in the County's general fund.' (Section 2.08.401) Translation: Supervisors 'can' decide to spend **nothing** ($0.00, *zilch*, nada) **for helping the homeless**."[10]

Finally, the County's voter information guide included the text of Measure W itself, which expressly stated the tax was to be placed in the general fund for general purposes. "Where, as here, the voters are provided the whole text of a proposed law or ordinance, we ordinarily assume the voters voted intelligently on the matter." (*Owens*, *supra*, 220 Cal.App.4th at p. 126.)

In sum, the Association "must . . . demonstrate that the ballot materials had 'profoundly misled the electorate.' [Citation.] Appellants do not come close to meeting this standard. We therefore reject their due process claims." (*Owens*, *supra*, 220 Cal.App.4th at p. 126.)

---

[10] The Association relies on a County grand jury report criticizing the partiality of the Measure W ballot question, but this does not demonstrate the ballot materials, considered as a whole, were materially misleading.

C.    *State Sales Tax Cap*

The Association's complaint alleges Measure W violates state laws limiting aggregate local sales taxes to 2 percent, and further alleges state statutes authorizing exemptions to this limit for the County are unconstitutional.  We affirm the trial court's orders sustaining the County's demurrers to these claims.

1.    *Compliance With State Statutes*

State law provides that a county's combined sales taxes "may not exceed 2 percent."  (Rev. & Tax. Code, § 7251.1; see also *id.*, § 7285.3.)  An exemption applicable in the County provides that a tax "of no more than 0.5 percent" approved by the electorate consistent with Proposition 218 does not count toward this rate limit.  (Rev. & Tax. Code, § 7292.2, subds. (a) & (b)(1)(A).)  A sales tax imposed by the San Francisco Bay Area Rapid Transit District also does not apply to the County's rate limit.  (Pub. Util. Code, § 29140, subd. (b)(1).)

The trial court found Measure W does not raise the County's combined sales taxes above 2 percent when the statutory exemptions are accounted for. As relevant here, the trial court discussed Measure C, another half-cent sales tax approved by County voters in 2020, which was being challenged in a separate lawsuit.  The trial court reasoned, "[The Association] argues that Measure C and Measure W cannot both claim the exemption from [Rev. & Tax. Code s]ection 7292.2.  In this they are correct, the availability of the exemption is not tied to a specific local tax: if either is valid, the exemption would apply to it.  If both are valid, the exemption applies to one and not the other.  Even if Measure C is valid and 'uses up' the half-cent sales tax exemption in [Rev. & Tax. Code s]ection 7292.2, subdivision[s] (a) and (b)(l)(A), and Measure W therefore counts toward the sales tax cap, the total

14

nonexempt sales tax in Alameda County varies from 1.5 to 2.0 cents per dollar, depending on the municipality, with 1.5 cents per dollar in local taxes exempt from the cap. The causes of action seeking a declaration that Measure W is invalid as in excess of the sales tax cap therefore fails to state a claim." Measure C was subsequently deemed valid, a determination affirmed by this court. (*County of Alameda v. Alameda County Taxpayers' Assn., Inc.* (2024) 99 Cal.App.5th 226.)

On appeal, the Association argues the statutory exemption does not apply to Measure W for a number of reasons, including that Measure C has been deemed valid. The Association's argument fails to demonstrate the trial court erred in finding the County's total nonexempt sales tax does not exceed 2 percent, even if the Revenue and Taxation Code section 7292.2 exemption does not apply to Measure W.

### 2. *Constitutionality of Tax Cap Exemptions*

The Association alternatively argues the bills enacting the sales tax cap exemptions for the County are unconstitutional special legislation under California Constitution article IV, section 16, which provides: "(a) All laws of a general nature have uniform operation. [¶] (b) A local or special statute is invalid in any case if a general statute can be made applicable." We reject the claim.

In 2017, the Legislature enacted Senate Bill No. 703 (2017–2018 Reg. Sess.), which added the statute authorizing County voters to enact a half-cent sales tax exceeding the 2-percent cap. (Stats. 2017, ch. 651, § 3 [adding Rev. & Tax. Code, § 7292.2].) Senate Bill No. 703 provided similar authorization to another county and a city. (Stats. 2017, ch. 651, §§ 1, 4.) The Legislature expressly found a special statute was necessary "because of the unique fiscal pressures being experienced in the [identified localities] in providing

15

essential programs." (Stats. 2017, ch. 651, § 5.) In 2019, the Legislature enacted Assembly Bill No. 723 (2019–2020 Reg. Sess.) to provide that neither the exemption previously enacted by Senate Bill No. 703 nor a sales tax imposed by the Bay Area Rapid Transit District would count towards the County's state sales tax cap. (Stats. 2019, ch. 747, §§ 1, 3 [amending Pub. Util. Code, § 29140 and Rev. & Tax. Code, § 7292.2].) The bill provided a similar exemption for a sales tax imposed by a transit district in another county. (Stats. 2019, ch. 747, § 2.) The Legislature found this special statute was necessary "because of the unique fiscal pressures being experienced in the" two counties. (Stats. 2019, ch. 747, § 4.)

"[W]hile a legislative classification is improper if it is not founded upon some natural, constitutional or intrinsic distinction which reasonably justifies a difference in treatment, a classification which has a substantial relation to a legitimate object to be accomplished is valid. If any state of facts can reasonably be conceived which would sustain a statutory classification, there is a presumption that this state of facts exists and the burden of demonstrating arbitrariness rests upon the party who assails the classification." (*Board of Education v. Watson* (1966) 63 Cal.2d 829, 833 (*Watson*).) "It is well settled that [California Constitution] article IV, section 16 does not prohibit the Legislature from enacting statutes that are applicable solely to a particular county or local entity. [Citations.] . . . In determining whether 'a general statute can be made applicable,' the issue is not whether the Legislature could conceivably enact a similar statute affecting every locality. [Citation.] Rather, it is whether 'there is a rational relationship between the purpose of the enactment . . . and the singling out of [a single] . . . county affected by the statute.' [Citations.] The Legislature's determination that this rational relationship exists is entitled to great weight

16

and will not be reversed unless the determination is arbitrary and without any conceivable factual or legal basis." (*White v. State of California* (2001) 88 Cal.App.4th 298, 305 (*White*).)

In both bills, the Legislature found "unique fiscal pressures" in the specified localities warranted the exemptions from the state sales tax cap. Authorizing additional taxes for certain localities is rationally related to the purpose of alleviating unique fiscal pressures in those localities. That the Legislature did not identify the specific fiscal pressures, as the Association complains, is of no moment: the relevant analysis is whether "any state of facts can reasonably be conceived which would sustain a statutory classification." (*Watson, supra*, 63 Cal.2d at p. 833.) The Association also argues the fact that the bills identify more than one locality means the localities cannot be unique. The Legislature could reasonably determine that certain localities face fiscal pressures not faced by the state's remaining localities. The Association provides no authority for its contentions that a bill exempting an existing tax is reviewed with greater scrutiny than one exempting a future tax, or that the absence of sunset provisions renders the bills unconstitutional.

"Here, the Legislature identified a reasonable and rational basis for the need to enact legislation directed only to [the County and certain other localities]. . . . The Legislature has the authority to determine the best method for resolving state fiscal issues, and it is not for the court to second-guess its determination." (*White, supra*, 88 Cal.App.4th at p. 307.) The Association's conclusory assertion that it should be granted leave to amend, without explaining " ' "in what manner [it] can amend [its] complaint and how that amendment will change the legal effect of [its] pleading," ' " is unavailing. (*Vann, supra*, 97 Cal.App.5th at p. 1020.)

17

D.    *Conclusion*

We have affirmed the trial court's orders sustaining the County's demurrers as to all of the Association's claims challenging the validity of Measure W.  Accordingly, we affirm the trial court's determination that Measure W is valid.

III.    *Procedural Challenges*

The Association raises various procedural challenges to the trial court's issuance of the appealed-from judgment.  We reject these contentions.

A.    *Additional Background*

1.    *Legal Background*

Sections 860 to 870.5 are often referred to as the "validation statutes." (See *Davis v. Fresno Unified School Dist.* (2023) 14 Cal.5th 671, 680 & fn. 2 (*Davis*).)  "Under the validation statutes a public agency may seek a judicial determination of the validity of some matter, such as an ordinance, resolution, or other action taken by the agency.  (§ 860.)  If the agency does not seek validation within the time required, any 'interested person' may file what is sometimes called a reverse validation action to test the validity of the matter.  (§ 863.)  The validation procedure is intended to provide a uniform mechanism for prompt resolution of the validity of a public agency's actions." (*Katz v. Campbell Union High School Dist.* (2006) 144 Cal.App.4th 1024, 1027–1028 (*Katz*).)  "[W]hen the validation statutes apply, they supersede other mechanisms by which an interested private party might seek to challenge the same agency matter.  This preclusion of alternative remedies is necessary if the validation statutes are to serve their purpose of once and for all determining the validity of the agency matter." (*Davis*, at p. 685.)

" 'A validating proceeding differs from a traditional action challenging a public agency's decision because it is an in rem action whose effect is binding

18

on the agency and on all other persons.' " (*Planning & Conservation League v. Department of Water Resources* (2000) 83 Cal.App.4th 892, 921 (*Planning & Conservation*); see also § 860 [validation action "shall be in the nature of a proceeding in rem"].) Because the outcome of a validation action is binding on all persons, the validation "procedure 'assures due process notice to all interested persons.' " (*Katz, supra*, 144 Cal.App.4th at p. 1028.) Specifically, in a validation action challenging a public agency's action, the validation statutes provide the summons "shall be directed to 'all persons interested in the matter of (specifying the matter)' " as well as to "the public agency." (§§ 861.1, 863; see also *Planning & Conservation*, at p. 922 ["Interested persons must have notice by publication of summons before the court can obtain in rem jurisdiction of the validation action"].)

" 'A key objective of a validation action is to limit the extent to which delay due to litigation may impair a public agency's ability to operate financially.' [Citation.] To that end, the validation statutes enable a ' " 'speedy determination of the validity of the public agency's action . . . plac[ing] great importance on the need for a single dispositive final judgment.' [Citation.] The validating statutes should be construed so as to uphold their purpose, i.e., 'the acting agency's need to settle promptly all questions about the validity of its action.' " ' " (*McGee v. Torrance Unified School District* (2020) 49 Cal.App.5th 814, 822 (*McGee*), disapproved on another ground in *Davis, supra*, 14 Cal.5th at pp. 698–699.)

With respect to challenges to local government sales taxes, state law requires that "[a]ny action or proceeding filed on the basis that a [local government sales] tax ordinance . . . is . . . invalid and filed for the sole purpose of contesting the validity of the [local government sales] tax, shall be commenced pursuant to [the validation statutes]." (Rev. & Tax. Code,

§ 7270.5.) State law further provides that, during the pendency of any such action, the proceeds of the challenged sales tax shall be held in escrow unless and until the tax is deemed valid. (Rev. & Tax. Code, § 7270, subd. (c) [required contract between local governments and state agency to administer local tax ordinances "shall . . . contain a provision that, in the event that a legal action is commenced challenging the validity of the tax in its entirety, as opposed to its application to an individual taxpayer, the district shall place the tax proceeds into an interest-bearing escrow account until the legality of the tax is finally resolved by a final and nonappealable decision rendered by a court of competent jurisdiction"]; see also *id.*, §§ 20, subd. (a), 7252.)

### 2. *Procedural Background*

The Association's complaint alleges a number of claims challenging the validity of Measure W. Some of these claims are alleged against both the County and "all persons interested in Alameda County Measure W on the November 3, 2020 ballot" (All Persons Interested), as required by the validation statutes. We will refer to all of the claims challenging the validity of Measure W as the validation claims.[11]

The complaint's remaining two claims relate to the November 2020 election but do not challenge Measure W's validity: a claim that the County failed to include all required information in its certified statement of election results (Elec. Code, § 15374, subd. (b)); and a Public Records Act claim (Gov.

---

[11] Some of the Association's claims challenging the validity of Measure W are alleged as claims for declaratory relief. These claims are alleged against the County but not against All Persons Interested. The due process claim discussed above (*ante*, part II.B.) is alleged against the County and its registrar of voters, but not All Persons Interested. As we discuss below (*post*, part III.C.), these are all validation claims, regardless of their denomination in the complaint.

Code, §§ 7920.000–7931.000, former §§ 6250–6277). We shall refer to these two claims as the nonvalidation claims.

The trial court overruled the County's demurrer to the nonvalidation claims. In March 2022, after the court sustained without leave to amend the County's demurrers as to all of the validation claims, the County filed an answer as to the nonvalidation claims.

Over a year later, in July 2023, the nonvalidation claims remained pending and the County filed a motion to dismiss the lawsuit and enter final judgment as to All Persons Interested and/or the validation claims. The County's motion submitted evidence that, as required by law, the proceeds of Measure W were being held in escrow during the pendency of the litigation challenging Measure W's validity. The County argued that granting its motion would facilitate a final resolution of the validation challenges in furtherance of the validation statutes' purpose of promptly resolving such challenges.

After the County filed its motion to dismiss, the Association filed a request for entry of default as to All Persons Interested "except COUNTY OF ALAMEDA and [its registrar of voters]." The clerk entered the default on the same day. The Association then opposed the County's motion to dismiss, arguing that the entry of default as to All Persons Interested mooted the County's motion to dismiss as to those defendants, and that the validation claims could not be dismissed while the nonvalidation claims were pending. The Association subsequently filed a request for a default judgment as to All Persons Interested.

In August 2023, following a hearing, the court granted the County's motion to dismiss as to All Persons Interested and the validation claims. The court issued an order captioned, in part, "Judgment" (capitalization altered),

21

deeming Measure W valid.  The Association filed a notice of appeal from this order.

B.    *Default*

The Association first argues the trial court prejudicially abused its discretion in granting the motion to dismiss despite the entry of default as to All Persons Interested, and in refusing to grant the Association's application for a default judgment as to All Persons Interested.  We reject the contentions.

In validation actions, "the validity of a matter is not decided piecemeal. That is the reason validation actions are designated as actions in rem.  When any person files a validation action, the validity of the matter is decided once and for all in that action.  (§ 870.)" (*Katz, supra*, 144 Cal.App.4th at p. 1032; see also § 870, subd. (a) [once final, the judgment in a validation proceeding "shall . . . be forever binding and conclusive, as to all matters therein adjudicated or which at that time could have been adjudicated, against the agency and against all other persons"].)  "The very purpose of an in rem action is to provide a binding judgment against the world." (*Planning & Conservation, supra*, 83 Cal.App.4th at p. 921.)

Thus, All Persons Interested are bound by the outcome of the Association's validation challenge, regardless of whether any particular interested person other than the County appeared in the action.  The trial court rejected the Association's validation claims and this result (which we are affirming) is binding on the Association, the County, and the world, including All Persons Interested.  Accordingly, the trial court did not err in granting the County's motion to dismiss and issuing judgment in favor of All

Persons Interested despite the entry of default.[12]  For the same reason, the trial court did not err in refusing to issue a default judgment against All Persons Interested and in favor of the Association.  (See *Los Defensores, Inc. v. Gomez* (2014) 223 Cal.App.4th 377, 392 ["the trial court may not enter a default judgment when the complaint's allegations do not state a cause of action"].)[13]

C.     *Judgment*

The Association contends the trial court erred in issuing judgment as to All Persons Interested and the validation claims while the nonvalidation claims remained pending.  We reject the challenge.

The Association argues the trial court's judgment violates the one final judgment rule.  "The 'one final judgment' rule provides that an appeal may be taken from a final judgment, but not an interlocutory judgment." (*First Security Bank of California, N.A. v. Paquet* (2002) 98 Cal.App.4th 468, 473.) However, " 'it has long been the settled rule that in a case involving multiple parties, a judgment is final and appealable when it leaves no issues to be determined as to one party.' " (*Heshejin v. Rostami* (2020) 54 Cal.App.5th 984, 991; see also § 579 ["In an action against several defendants, the Court may, in its discretion, render judgment against one or more of them, leaving

_____

[12] The entry of default alone did not preclude judgment in favor of All Persons Interested.  (See *Western Heritage Ins. Co. v. Superior Court* (2011) 199 Cal.App.4th 1196, 1211, fn. 21 [" '[W]here there are two or more defendants and the liability of one is dependent upon that of the other the default of one of them does not preclude his having the benefit of his codefendants establishing, after a contested hearing, the nonexistence of the controlling fact; in such case the defaulting defendant is entitled to have judgment in his favor along with the successful contesting defendant' "].)

[13] Because the Association could not have obtained a default judgment against All Persons Interested, the Association fails to demonstrate prejudice from any procedural error with regard to setting aside the entry of default.

the action to proceed against the others, whenever a several judgment is proper"].)

The court's orders sustaining the County's demurrers as to the validation claims leave nothing to be decided between the Association and All Persons Interested. As there are no pending claims alleged against All Persons Interested, judgment as to All Persons Interested constitutes a final judgment as to that party and is properly appealable under the one final judgment rule.[14]

This reasoning applies as to all of the claims we have termed the validation claims, even though not all are expressly alleged against All Persons Interested. "The form of the claim does not govern; we must examine ' "[t]he gravamen of a complaint and the nature of the right sued upon," ' in order to determine whether [the plaintiff's] claims fall within the validation statutes." (*McGee*, *supra*, 49 Cal.App.5th at pp. 826–827.) Where, "regardless of how [the plaintiff] characterizes [its] claims or the relief [it] seeks, the gravamen is the invalidity of the [public agency action]," the claim properly falls within the validation statutes. (*Id.* at p. 827; see also *Katz*, *supra*, 144 Cal.App.4th at p. 1034 ["Plaintiff's cause of action for injunction seeks to restrain levy of the tax. This is merely a request for invalidation of the tax stated in other words."].) Thus, the Association's claims for declaratory relief based on the same theories as its invalidation claims, as well as its claim seeking "a declaration and order that the Measure W election is invalidated because the ballot materials were so misleading or inaccurate that they violated due process," are properly construed as validation claims. "[W]hen the validation statutes apply, they supersede

---

[14] Because of this conclusion, we need not decide whether judgment on the in rem validation claims was appealable as severable from judgment on the in personam nonvalidation claims, as the parties dispute.

24

other mechanisms by which an interested private party might seek to challenge the same agency matter." (*Davis*, *supra*, 14 Cal.5th at p. 685.) Accordingly, all of the claims we have termed the validation claims are properly construed as being brought under the validation statutes and thus apply to All Persons Interested.

The Association complains that the trial court entered judgment on the validation claims as to the County as well as All Persons Interested, yet the nonvalidation claims against the County and its registrar of voters remain pending. "Where the issues involved in an appeal are 'inextricably intertwined' with claims raised by a party still involved in litigation at the trial court level, 'judicial economy' permits that party to join in the appeal." (*CAZA Drilling (California), Inc. v. TEG Oil & Gas U.S.A., Inc.* (2006) 142 Cal.App.4th 453, 465 (*CAZA*).) Such is the case here. Further, the County is *an* interested person—a fact recognized by the Association's request for entry of default as to All Persons Interested "*except* COUNTY OF ALAMEDA and [its registrar of voters]." (Italics added.) The County is properly a party to this appeal.[15]

Our conclusion that the judgment complies with the one final judgment rule is consistent with the purposes underlying the validation statutes of providing a " ' " 'speedy determination of the validity of the public agency's action.' " ' " (*McGee*, *supra*, 49 Cal.App.5th at p. 822; see also *ibid.* [" ' " The validating statutes should be construed so as to uphold their purpose, i.e., 'the acting agency's need to settle promptly all questions about the validity of its action' " ' "].) Assuming that nonvalidation claims against a public entity can be brought in the same lawsuit as validation claims—an issue on which

---

[15] For the same reason, the County's registrar of voters—who is a named defendant on the invalidation due process claim—is properly a party to this appeal as well. (*CAZA*, *supra*, 142 Cal.App.4th at p. 465.)

we express no opinion (see *Davis*, *supra*, 14 Cal.5th at p. 686 [noting "several courts have held that when an interested party brings a timely validation action, it can join other claims" (italics omitted)])—the litigation of the nonvalidation claims may well, as here, be separate from and subsequent to that of the validation claims. Construing final orders on the validation claims as constituting a final disposition as to one party, all interested persons, is consistent with the purpose of the validation statutes. To hold otherwise could enable plaintiffs in reverse validation actions to, intentionally or not, delay final resolution of validation claims by adding numerous nonvalidation claims, in contravention of this purpose. (See *McGee*, at p. 823 ["years-long delay destroyed the very purpose behind the validation statutes—'to settle *promptly* all questions about the validity of an agency's action' "].)

The Association's remaining challenges to the judgment are easily disposed of. California Rules of Court, rule 3.1312, as the Association acknowledges, applies to motions, and we see no basis to expand its procedural requirements to proposed judgments.[16] Arguments based on the entry of default against All Persons Interested are foreclosed by our conclusion that the entry of default did not preclude the court's order granting the County's motion to dismiss (*ante*, part III.B.). The County's conduct requesting entry of default against "all persons interested" in a validation action brought by the County involving a different ballot proposition did not judicially estop it from seeking judgment on the reverse validation claims here, because entry of default in that case was obtained

---

[16] The Association forfeited any reliance on a different court rule by raising it for the first time in its reply brief. (*Tellez v. Rich Voss Trucking, Inc.* (2015) 240 Cal.App.4th 1052, 1066 [" ' "[p]oints raised for the first time in a reply brief will ordinarily not be considered" ' "].)

prior to a ruling on the merits of validation and was therefore not inconsistent with the County's position in this case. (See *Owens*, *supra*, 220 Cal.App.4th at p. 121 ["elements of judicial estoppel" include that " 'the two positions [taken by the same party] are totally inconsistent' "].)

Accordingly, the trial court's entry of judgment was proper and the order is appealable.

## DISPOSITION

The judgment is affirmed. The County is awarded its costs on appeal.

SIMONS, J.

We concur.

JACKSON, P. J.
CHOU, J.

**Alameda County Taxpayers' Association, Inc., et al. v. County of Alameda et al. (A168775)**

Trial Court:        Superior Court of California, County of Alameda

Trial Judge:        Hon. Jeffrey S. Brand

Counsel:        Law Offices of Jason A. Bezis and Jason A. Bezis for Plaintiffs and Appellants.

Colantuono, Highsmith & Whatley, Michael G. Colantuono, John A. Abaci and Conor W. Harkins for Defendants and Respondents.